[No. 28868.    Department One.    November 25, 1942.]

HARRY BETZ, *Respondent*, v. TACOMA DRUG COMPANY, *Appellant*.[1]

¹Reported in ·131 P. (2d) 183.

*Henderson, Carnahan & Thompson,* for appellant.

*Frank L. Cathersal,* for respondent.

JEFFERS, J.—This action was instituted by Harry Betz against Tacoma Drug Company, a corporation, to recover damages for breach of an alleged real estate option, claimed to have been given by defendant to plaintiff.

The complaint in substance alleged that on March 19, 1936, plaintiff and defendant, through its president, C. F. Osmers, entered into an option agreement, which was given to plaintiff for a period of sixty days from March 19, 1936, for a stated consideration of one dollar, and which covered certain real estate in the city of Tacoma, which it is alleged belonged to defendant. The original option was extended some eight times up to March 1, 1939.

It is further alleged that on September 29, 1939, plaintiff and defendant, through its president, entered into an additional option agreement, which agreement was signed, "Tacoma Drug Company, by C. F. Osmers, President," and recited a consideration of one dollar, and covered a period of one year from date. On the bottom of this instrument appears the following: "For value received this option is hereby extended for one year additional. [Signed] Tacoma Drug Company, Wholesale Druggists, Tacoma, Washington, C. F. Osmers, Pres."

It further appears from this option that, upon the payment of five hundred dollars to defendant company by Mr. Betz, the company agreed to quitclaim to Mr. Betz the real estate therein described.

The complaint further alleged that on September 27, 1941, plaintiff tendered to defendant the sum of five hundred dollars, and demanded a deed, but the tender was refused, and defendant has at all times since re-

fused such tender, and refused to execute and deliver a deed to plaintiff.

Defendant, by its answer, denied generally the allegations of the complaint, and denied specifically that it ever signed any of the documents referred to in the complaint. It admitted that C. F. Osmers was president of defendant company, and that he signed the documents above referred to; denied that Mr. Osmers was ever authorized to execute any of the documents for and on behalf of defendant; admitted that it is the owner of a private alley, included in the purported option; and admitted that it refused to accept plaintiff's tender and deliver a deed to plaintiff.

As a first affirmative defense, defendant alleged that it received no consideration whatsoever from plaintiff or any other person for the alleged option agreement and extensions thereof. By his reply, plaintiff denied the affirmative matter contained in defendant's answer.

The cause came on for hearing before the court without a jury, and, thereafter, on May 16, 1942, the court made and entered findings of fact, particularly finding of fact No. IV, from which it concluded that plaintiff was entitled to judgment against defendant in the sum of six hundred seventy-five dollars. Judgment for that amount was entered, and this appeal by defendant followed.

Appellant makes six assignments of error, but, in view of the conclusions we have reached, it will be necessary to consider only assignment of error No. 1, which states:

"The court erred in finding No. IV, in which it found that the option agreements referred to therein were legal and binding contracts of appellant."

In finding of fact No. IV, the court found that the option agreements of March 19, 1936, and September

29, 1939, and extensions thereof, were in fact the agreements of appellant.

It is contended by appellant that the uncontradicted evidence shows that Mr. Osmers was neither authorized by the directors to execute these various documents, nor was his action in so doing ever ratified by the directors. Respondent has filed no brief herein, so we do not have the benefit of his argument. Before passing to the evidence bearing on the authority of Mr. Osmers, as president of appellant, to execute the purported option agreements and extensions thereof, it might be well to give a brief history of the property covered by the option.

Respondent and his brother were at one time the owners of certain real estate in the city of Tacoma described as blocks 1502 and 1503, New Tacoma. This property is in the form of a triangle, and divided into parcels A, B, C, D, and E, with a frontage of 449.158 feet on Pacific avenue, and 241.127 feet on south Fifteenth street. Parcels A, B, C, and D are improved, but parcel E is not and never has been improved. It lies back of and to the east of parcels A, B, and C, and to the west and south of parcel D. Parcel E has been used by the abutting property owners as a private alley for the movement of goods in and out of their buildings by trucks. This so-called alley has no outlet for vehicular traffic other than onto south Fifteenth street, so cars and trucks must enter and leave through the opening on south Fifteenth street. There is a spur track running up this alley, which connects with the main line of the Northern Pacific Railway Company.

Respondent, during the time he and his brother owned this property, placed three mortgages upon it, one covering parcel A, another covering parcels B and C, and the third covering parcel D. The holder of the mortgage on parcel A, Tower Savings Bank, foreclosed

its mortgage first, and took a deficiency judgment against respondent and his brother. Under the deficiency judgment, Tower Savings Bank levied upon and had sold tracts B, C, D, and E, and thereafter sold and conveyed to appellant all its interest in parcel A acquired under the mortgage foreclosure, and all interest acquired by it in tracts B, C, D, and E under and by virtue of the execution sale.

Under the execution sale, appellant, through Tower Savings Bank, acquired title to parcels B and C, subject to the mortgage of Provident Mutual Life Insurance Company, and parcel D, subject to the mortgage of the Mortgage Bond Company, and parcel E (the alley), subject only to a perpetual easement in favor of the owners and occupants of parcels B and C, for purposes of ingress and egress, to a strip described as parcel F, which extends from south Fifteenth street along the east side of parcels A, B, and C, and gives an outlet onto south Fifteenth street to the rear entrance to the buildings on parcels B and C. The only rights appellant has in parcel E (the alley) are those acquired by virtue of the execution sale.

The mortgages on parcels B, C, and D have been foreclosed, and we are here concerned only with parcel E.

The purported options contained a description of all of parcel E, except a ten foot strip immediately back and to the east of appellant's parcel A. It is apparent that, if appellant were to convey all of parcel E except a ten foot strip immediately back of parcel A, it would seriously interfere with appellant's right of ingress and egress for truck operations to the rear of its building, and would deprive it entirely of its right to load and unload goods on the spur track of the Northern Pacific.

With this picture of parcel E in mind, let us look at the evidence bearing on the authority of Mr. Osmers

to execute and deliver the documents above referred to.

Mr. Osmers testified substantially as follows: That he had been president of appellant company since it was organized; that the business of the company was the wholesaling of drugs to retail drug stores, and that it had no other business and did not deal in real estate, except its own; that he signed the documents referred to in the complaint, being the original option, the extensions thereof, the option of September 29, 1939, and the extension thereof; that, when Mr. Betz talked to him about an option, Mr. Osmers had no thought of giving an option on all of parcel E (the alley), except the ten feet immediately back of appellant's building; that he understood Mr. Betz had some plan he was trying to put through to redeem some of the property covered by the mortgages, and he had in mind to help Mr. Betz, so long as it did not interfere with appellant's rights in the alley; that he had never taken up the matter of these options or extensions with the board of directors, and that he told Mr. Betz it was only his signature and that he would have to get the approval of the board of directors, in order to make it binding.

It further appears from the testimony of this witness that he owns about twenty per cent of the issued stock of the corporation, and the other eighty per cent is distributed among about fifty stockholders; that there are seven members of the board of directors, five of whom are not employees of the company, but have their own businesses; that the directors have regular meetings; that, about the time this suit was threatened, Mr. Osmers called the matter to the attention of the board, and the board by resolution refused to ratify the action of Mr. Osmers and refused to meet the requirements of the option by giving a quitclaim deed to all of tract E except the ten feet adjoining parcel A on the east. Mr. Osmers testified that he did not sooner call the matter

to the attention of the board, as he did not think Mr. Betz would ever be in a position to take up the option, but that, if and when he did, the witness intended to take up the matter with the board.

On cross-examination, Mr. Osmers testified that he signed these documents in his individual capacity, as he knew he did not have the right to sign for the corporation; that he realized that in signing he was acting for the company, but subject to the approval of the directors; that the extensions were given on his own responsibility, subject to the approval of the directors.

This witness testified to the use of the alley by appellant in loading and unloading goods from trucks and cars on the Northern Pacific spur, and that it was necessary that appellant have the use of the alley for its operations. Mr. Osmers did not know where the description which was in the option agreement came from.

Scott Henderson testified that he was secretary of appellant company, but had not been a director since 1928. Mr. Henderson identified article 3, § 1, of the by-laws, which provides:

"The president shall preside at all meetings of the corporation or meetings of the stockholders of the corporation and of the board of trustees and shall perform such other duties as he may be directed to perform by the board of trustees, and shall have general oversight over the business affairs of the corporation."

Mr. Henderson further testified that there was no resolution or by-law investing any power in the president other than as set forth in article 3, § 1; that there was no by-law or resolution authorizing the president or any other officer to convey any of the company's real estate, nor any by-law, resolution, or document which vests in the manager of the corporation the right to convey real estate, except by direction of the board.

This witness further testified that he remembered Mr. Betz coming to his office and having a conversation with him about an option; that he advised Mr. Betz the option was subject to the action of the board of directors, and that he did not sign it as secretary, as he advised Mr. Betz it would have to be approved by the board; that he did not remember where the description in the option came from, but that it was his understanding the alley should be kept open and remain in appellant. Mr. Henderson further testified that he had nothing to do with any of the extensions of the original option, nor with the option of September, 1939, nor its extension; that he never heard the matter of these options mentioned in board meeting until September 29, 1941, at which time all of the directors were present, and at which time the directors refused to confirm the option or permit it to be exercised.

Mr. Betz denied he was ever told the option would have to be approved by the board of directors.

It appears, then, from the uncontradicted testimony that Mr. Osmers, as president of appellant company, signed the purported options and extensions thereof. It appears from the by-laws that neither the president nor general manager of the company was expressly authorized to convey or agree to convey real estate of the company. It further appears that Mr. Osmers was never authorized by the board of directors to enter into the original option agreement, nor any of the extensions thereof, nor the agreement of September 29, 1939, nor its extension.

It further appears that the board of directors knew nothing of this transaction until 1941, at which time the matter was brought before the board, and at which time they refused to ratify the acts of Mr. Osmers. It does not appear that appellant ever received one cent as consideration for either of the options or the exten-

sions, or that appellant in any way ever ratified the acts of Mr. Osmers. It was not shown that there was any custom or usage whereby the company had permitted Mr. Osmers to deal in the company's real estate, without being authorized so to do by the board.

The above facts being undisputed, we are of the opinion that there was no evidentiary support for the court's finding that the options and extensions thereof were the agreements of appellant, and it follows that the court erred in making such finding and in concluding that appellant was liable for a breach of such agreements.

In 3 Thompson on Corporations (3d ed.), § 1565, a comprehensive statement is made relative to the powers of the president of a corporation merely by virtue of his office.

In *Reuter Organ Co. v. First Methodist Episcopal Church,* 7 Wn. (2d) 310, 109 P. (2d) 798, in holding that Mr. Sibbald, ex-officio as president of the board of trustees, had no authority to bind the church by setting up a new date for the running of the statute of limitations as against an obligation of the church, we quoted from Thompson on Corporations, *supra,* and also quoted from 19 C. J. S. 97, § 752, as follows:

" 'Aside from his position as presiding officer of the board of directors and of the stockholders when convened in general meeting, the president of a corporation has, by virtue of his office merely, no greater power than that of any director. Whatever authority he has must be expressly conferred on him by statute, charter, or by-law or the board of directors or be implied from express powers granted, usage or custom, or the nature of the company's business.' "

The rule, as applied to the power of the president of a corporation to transfer corporate property, is stated in 19 C. J. S. 533, as follows:

"The president of a corporation has no power, by vir-

tue of his office, to sell or otherwise dispose of the corporate franchises, or of its real or personal property, when this is not in the regular course of the company's business; nor can he appoint an agent to make such sale; and it has been held that he has not such power even though he is authorized to act as superintendent or general manager in the conduct of the corporation's ordinary and routine business. The president, however, may sell or otherwise dispose of the corporate property where such power is conferred on him by the directors or other governing body, or by a recognized usage of the corporation; or where the transaction is in the ordinary course of business; or where the president has such entire management of the corporate business as clothes him with apparent authority to act for it in all respects; or where he owns substantially all of the stock and the corporation is in reality a mere agency to carry out his will."

We have recognized some of the exceptions set out in the above quotations. Thus in *Kitzmiller v. Pacific Coast etc. Co.*, 90 Wash. 357, 156 Pac. 17, we recognized the right of the general manager of the defendant corporation, where there was no limitation or restriction placed upon his express authority, to enter into a contract for the purchase of tin for cans to contain the season's pack of salmon, and pay therefor with a shipment of salmon. It will be noted that the above contract pertained to the general business of the defendant. The case might be applicable here if Mr. Osmers had entered into a contract for the sale of drugs. In the instant case, the option contract covered real estate necessary for and used in the operation of appellant's business, and, in fact, bought for the particular purpose of facilitating loading operations from the rear of its building.

We held in *Peninsular Savings & Loan Ass'n v. C. J. Breier Co.*, 137 Wash. 641, 243 Pac. 830, that, while the local manager of the defendant corporation's store had no express authority to lease a building in which to operate the store, he had apparent authority, under

the facts in the case, to make a binding lease. We, of course, recognize the rule that a corporation may be bound by the contracts of its agent, if within the apparent scope of his authority, although beyond his express authority. The last cited case is based upon this rule, and under the facts the rule was properly applied. The cited case, in our opinion, would not sustain a holding that the president of a corporation, merely by virtue of his office, having no express authority either in the by-laws or from the directors, and there being no recognized custom allowing him to deal in the company's real estate, could bind the corporation to convey real property necessary to its operations.

An examination of the case of *Parker v. Hill,* 68 Wash. 134, 122 Pac. 618, will show that the somewhat complicated facts justified the conclusion that O. G. Parker, secretary of Hollon Parker Company, a corporation, had both apparent and actual authority to execute, on behalf of the company, the mortgages which the plaintiff, Hollon Parker, father of O. G. Parker, sought to have set aside and canceled. The case is not applicable here.

We have also recognized that the acts of an officer of a corporation may be ratified, where the corporation accepts the benefits of such a contract, and that, after accepting such benefits, the corporation cannot question the authority of the officer to make the contract. *Belcher v. Webb,* 176 Wash. 446, 29 P. (2d) 702.

There was no evidence in this case upon which ratification could be based. Appellant never received anything for the option, never knew anything about it until it was finally brought to the attention of the directors in 1941, when they promptly refused to confirm or ratify the agreement. We have held that there can be no implied ratification of the unauthorized acts of an

officer of a corporation, where there has been no evidence offered of any act showing ratification, such as acceptance of benefits, knowledge of the transaction, a failure to protest, and acts of like character. *Mooney v. Mooney Co.*, 71 Wash. 258, 128 Pac. 225.

Neither is this a case where the corporation's entity will be disregarded and the corporation regarded as the agent of the owner of substantially all the corporate stock, for in this case Mr. Osmers owned only about twenty per cent of the stock. Also, in the instant case the board of directors was composed of seven members, the board had regular meetings, and there is no evidence that Mr. Osmers ever dominated the board.

We conclude that, under the facts of this case and the law applicable thereto, Mr. Osmers, as president and manager of appellant corporation, had neither express nor apparent authority to bind appellant company by the option agreements and extensions thereof hereinbefore mentioned; that appellant at no time ratified the acts of Mr. Osmers, by accepting benefits or in any other manner.

For the reasons herein assigned, the judgment is reversed, with instructions to dismiss the action.

ROBINSON, C. J., MILLARD, STEINERT, and BLAKE, JJ., concur.