(127 App. Div. 663.)

### CONKLIN v. RAYMOND et al.

(Supreme Court, Appellate Division, First Department. July 8, 1908.)

1. PRINCIPAL AND AGENT—UNDISCLOSED AGENCY—ACTING IN AGENT'S NAME—NOTICE TO THIRD PERSON—RIGHTS OF PRINCIPAL—CONVERSION BY BROKER.

C., a member of a brokerage firm, had three separate accounts with defendants, one of which belonged to the firm and was known as the "C. Account," and two others belonging to C. individually, known as the "C. Special Account" and the "C. Short Account." C. subsequently requested defendants to open another account and to purchase certain shares of stock on margin, which was done. C. requested that the account be opened in his name as trustee, but defendants stated that they wanted no such account on their books, and C. said that he did not care what it was called, so long as it was understood that it belonged to another. Thereupon defendants designated the account as "C. Special No. 2 Account" and transferred to it the shares purchased. C. gave them plaintiff's check to himself for $2,500, to be credited on the account remarking that defendants could see for whom the account was opened. Thereafter other stock was purchased and placed to the account; an additional 100 shares which had been placed in that account by mistake

being transferred to one of C.'s individual accounts. The No. 2 account always showed a profit; but, as some of the other C. accounts showed a loss, defendants notified C. that they would sell out all of his accounts, including the No. 2, unless further margin was put up. C. notified them that the stock carried in the No. 2 account should not be sold, for those purchases were made for plaintiff, and could not be applied to any deficiency in the other accounts. Defendants transferred the stock and margin in the No. 2 account to the C. firm account, and sold all of the stock, realizing a profit from the No. 2 account of $2,546.47. After paying the indebtedness of C. on all accounts, there was a balance of $1,048.54, which defendants insisted on paying to C., and which he finally accepted and receipted for, though he protested that the money belonged to plaintiff. The agency of C. for plaintiff was not fully terminated at that time. *Held*, that plaintiff could recover for the conversion by defendants, but only for the balance above the amount paid to and receipted for by C.

2. SAME—DEFENSES—SETTLEMENT WITH PLAINTIFF'S AGENT.

While plaintiff could be compelled to look to C. for the money actually turned over to him, the receipt and a release given to defendants by C. did not operate to wholly extinguish plaintiff's claim, but was only the individual release of C., and, as defendants had notice of plaintiff's claim, they could only be credited with the amount actually paid.

McLaughlin and Ingraham, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Roland R. Conklin against Harry Raymond and others. From a judgment for plaintiff, defendants appeal. Modified and affirmed.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

Moses Weinman, for appellants.
Henry Wollman, for respondent.

HOUGHTON, J. This action is for the conversion through wrongful sale of stock which the plaintiff asserts belonged to him and which the defendants were carrying on margin.

The plaintiff claims to have dealt with the defendants through one Earle E. Carley. Carley was a member of the stock brokerage firm of Carley, Rosengarten & Carley and had had extensive dealings with the defendants. Prior to the purchase of the stock in controversy, Carley had three separate accounts with the defendants known, respectively as "Earle Carley Account," which to the knowledge of the defendants belonged to the firm of Carley, Rosengarten & Carley, and "Earle Carley Special Account," and "Earle Carley Short Account"; the two latter belonging to Carley individually. On the 19th day of November, 1900, Carley requested the defendants to open another account and to purchase for him 500 shares of stock on margin, which the defendants assented to, and on Carley's direction they purchased 100 shares of Consolidated Gas stock and notified him that they had done so. Carley then requested that they open the account in his name as "trustee," and, upon the defendants saying that they wanted no such account as that upon their books, he told them he did not care what it was called so long as it was understood that it was not his own, but belonged to another man. Thereupon the defendants designated it as "E. E. Carley Special No. 2 Account," and transferred to it the 100 shares of Consolidated Gas stock which had been purchased, and

Carley gave them plaintiff's check, payable to himself, for $2,500, remarking that the defendants could see for whom the account was opened. Thereafter 200 shares of New York Central stock were purchased and placed to this account; an additional 100 shares that had been by mistake placed in that account being transferred to one of Carley's individual accounts. The Consolidated Gas and New York Central stock was the only stock in the "Carley Special No. 2 Account" up to the time of the sale, except that intermediate 100 shares of Amalgamated Copper stock had been purchased and sold at a loss.

The "Carley Special No. 2 Account" always showed a profit. About the middle of December, some of Carley's other accounts showed a loss, and on all three of his other accounts defendants demanded additional margin, which he did not pay. Defendants thereupon notified Carley that they would sell out all of his accounts, including the "No. 2," unless the margin was forthcoming, and Carley then told them that they must not sell the stock they were carrying in the "Earle Carley No. 2 Account," for those purchases were made on behalf of plaintiff, and they could not apply the profit in that account to any deficiency in his other accounts. Notwithstanding this notice, the defendants transferred the stock and margin of the "Earle Carley Special No. 2 Account," or the "Earle Carley No. 2 Account," as it was variously called, to the "Earle Carley Account," which belonged to the brokerage firm of which he was a member, and which had sustained the largest loss, and sold all of the stocks of all of the accounts, realizing from the "Earle Carley Special No. 2 Account," which belonged to the plaintiff, a profit of $2,546.47. After paying all that Carley owed on all his accounts, there was left a balance of $1,048.54, which the defendant insisted upon paying over to Carley, and which he finally accepted and receipted for. The agency of Carley was not formally terminated when this payment was made to him, and, although he protested that the money belonged to the plaintiff he finally accepted it. The trial court gave plaintiff judgment for the full amount, without any deduction for this payment.

There are two distinguishing features which seem to me to fasten liability upon the defendants, and which distinguish the case from that of Timpson v. Allen, 149 N. Y. 513, 44 N. E. 171, and Read v. Jaudon, 35 How. Prac. 305, upon which appellants rely. The first is that the stocks were not purchased by Carley for his general account or placed in his general account, but were kept apart in one of his separate accounts. The second is that, conceding the remark made by Carley when he handed defendants plaintiff's check, that they "could now see who the account was for," the defendants had actual notice before any sale of the stock that that carried in "Special Account No. 2" belonged to the plaintiff.

It is true that the defendants refused to carry an account in Carley's name as "trustee." They were content however, to carry a separate account by a separate designation. There was, at least, notice to them that the stocks being purchased for the "No. 2 Account" were not purchased by Carley generally. They were paid on that particular account by separate payment all the margin they required. They never demanded any further margin for that account, but only for Carley's

other accounts. They had neither bought any more stock nor foregone any further margins on Carley's other accounts because of the "No. 2 Account." Their position was not changed in the least by the fact that the "No. 2 Account" was opened, and they never suffered any loss on account of it. Before they had changed their position at all, and before they had suffered any loss whatever that they would not otherwise have suffered from Carley's other accounts, the defendants admit they were notified that they must not take the surplus in the "No. 2 Account" to meet any deficiency in any of the other accounts. Notwithstanding this notice, they transferred the "No. 2 Account" to the Earle Carley account to cover the deficiency existing therein.

If the plaintiff had intrusted to Carley $2,500 for the purchase of stock on margin, and Carley had bought stock for his general account and had mixed the stock and the money with his own, the situation would have been entirely different, and the defendants would have been justified in saying that he could not sort out particular stock and claim it belonged to somebody else, and thus stop its sale for the purpose of meeting any deficiency on the general account.

I think the judgment was right, except that, Carley's agency not having been terminated, I think the defendants should have been credited with the $1,048.54 which they paid to him, notwithstanding what took place at the time of the payment.

It is true that Carley protested that the money did not belong to him, but he was still plaintiff's agent. The release which Carley gave, in view of what took place when it was delivered, did not operate to wholly extinguish the plaintiff's claim. It was only an individual release by Carley, and the defendants had ample notice that Carley did not pretend or assume to give any release in behalf of the plaintiff. On the contrary, he told them that, notwithstanding the release which he was giving, Conklin would hold them liable. Actual payment to an agent stands on somewhat different footing from the taking from him of a release in behalf of his principal. The utmost that can be done is to give defendants credit for the payment and compel the plaintiff to look to Carley for the money which he received.

The judgment should be modified by deducting therefrom the sum of $1,048.54, with interest from the 12th day of January, 1901, and, as so modified, affirmed, without costs of appeal to either party.

LAUGHLIN and SCOTT, JJ., concur.

McLAUGHLIN, J. (dissenting). This is an appeal from a judgment in favor of plaintiff in an action for conversion. The defendants are stockbrokers, and on the 19th of November, 1900, one Earle Carley had three speculative accounts with them, designated, respectively, "Earle Carley Account," "Earle Carley Short Account," and "Earle Carley Special." On that day Carley requested defendants to purchase for him certain stocks on margin, which was done, and notice given to him. He then requested that such purchases be carried by defendants under the name of "Earle Carley, Trustee." This the defendants absolutely refused to do, or to carry any such account on

their books, and it was then agreed, as the court has found, that the said purchase and future purchases for that account "should be carried on by the defendants with Carley personally and individually," in an account designated "Earle Carley No. 2." In payment of the margin for the first purchase in the "Earle Carley No. 2" account, Carley gave a check of plaintiff's for $2,500, payable to Carley and indorsed by him. He testified that when he delivered this check to one Hamill, who represented defendants, he said to him: "Now you can see whose account that is; there is the check." But this is denied by Hamill. In December, 1901, all Carley's accounts, except "Earle Carley No. 2," required further margins, and upon Carley's failure to make the required advances the defendants proceeded to close out his accounts. He then, for the first time, insisted that the "Earle Carley No. 2" account was a trust account for plaintiff, and that the defendants had no right to sell the stocks held thereunder, or to consolidate that account with the others. The defendants, notwithstanding, sold the stocks and paid over to him the balance, after combining all four accounts, of $1,048.54; Carley giving a receipt releasing them from any claims he might have, especially any in connection with the four accounts, and "ratifying and confirming all acts heretofore done by said firm in respect to the closing of the said several accounts with them and the sale and disposition of the various securities by them for the aforesaid several accounts." The plaintiff subsequently brought this action for the conversion of the stocks held by defendants under the "Earle Carley No. 2" account. The trial court found that the defendants knew, or should have known, that Carley was carrying this account as trustee for plaintiff, that the stocks were plaintiff's property, and he was therefore entitled to recover on the basis of the highest price of the stocks within 30 days after the sale, and gave judgment for the plaintiff in the sum of $3,146.47, with interest, from which defendants appeal.

The defendants purchased the stocks for Carley. They refused absolutely to deal with him as trustee. They dealt with him only as principal. This was understood by him and the defendants. He gave all the orders for buying or selling stocks, managed all the accounts as he saw fit, and on one occasion, at least, transferred stocks from the "Earle Carley No. 2" account to one of his other accounts. These facts are not disputed, and the court has so found. The first check for $2,500 signed by plaintiff and payable to Carley's order was no notice whatever to defendants of plaintiff's interest. On the contrary, the presumption was that the check belonged to Carley, inasmuch as it was made payable to his order. Timpson v. Allen, 149 N. Y. 513, 44 N. E. 171. Nor do I think that Carley's statement, when he turned over the check—assuming that it was made—was sufficient notice to bind the defendants. This is not a case of trust relationship at all, so far as defendants were concerned. In opening the account and thereafter making purchases for it, Carley was, as between himself and this plaintiff, his agent; but, as to the defendants, he was a principal. They had refused to and did not deal with him in any other way. The notices of the purchases and sales of securities were sent to

112 N.Y.S.—6

Carley, and by him sent to plaintiff, without the knowledge of defendants. These showed that the account was in Carley's individual name, and the plaintiff made no objection to it. Nor did he in any way suggest to the defendants, until after the accounts were closed, that that account belonged to him, or that he had any interest in it. The court has found as a fact that he had no talk with the defendants until after the accounts were closed and the balance paid to Carley. Having acquiesced in the arrangement, neither plaintiff nor Carley is in a position to claim against defendants that the No. 2 account could not be charged as a personal account of Carley's, when otherwise the rights of the defendants would be prejudiced. And it appears, when the stock was sold, the defendants' claim against Carley on the other three accounts would not have been satisfied if the No. 2 account had not been closed. The defendants, having been permitted and induced to act and deal with Carley in ignorance of the plaintiff's interest or rights in the transaction, had the legal right to insist that the entire dealings should be closed as if Carley only had been interested. The plaintiff permitted Carley to act, not as an agent or trustee, but as an individual without disclosing his true position, and the defendants by reason of that fact had the right to hold him to the position he was permitted to assume as regards any claim made by plaintiff growing out of the transaction. As was said in Read v. Jaudon, 35 How. Prac. 303:

"The case in this regard is like that of principal and agent where the agent is permitted to act and does act in his own name without disclosing his agency. In such case he may be treated as principal, and the right of set-off and all other equities attach as if he were in fact the principal and alone interested in the transactions, and, although the principal may step in and assert his rights, he will be held to take the place of his agent, and to have no other rights than those which his agent could have enforced had he been principal instead of agent."

Not only this, but Carley could at any time have authorized defendants to sell the stock which had been purchased for the "Earle Carley No. 2" account. This fact is conceded. Therefore, when he accepted the proceeds of the sale and signed the receipt, he expressly ratified the sale, and whether or not it be held that plaintiff might maintain an action to recover the proceeds of the sale, he certainly cannot maintain an action for conversion of the stock. The court found that "at the time of the said payment to Carley, and at the time of the delivery of said receipt and release, there was no termination of any trusteeship or agency in said Earle Carley, if any existed," having previously found that such trusteeship did exist. There is no legal ground upon which the judgment can be modified as directed by a majority of the court. The stocks were sold for $2,546.47 above all amounts owing to defendants thereon. After deducting the deficit from the other three accounts, $1,048.54 was paid to Carley. This payment can only be charged against the plaintiff on the theory that the stocks were legally sold. If they were converted by the defendants, then the plaintiff is entitled to recover the full amount found by the trial court, for the payment to Carley was entirely unauthorized.

But the whole judgment is wrong. The facts found show there

is no legal foundation for it. A stockbroker, even in these times, has rights which the courts will recognize and enforce. It takes something more than a statement: "Now you can see whose account it is. There is the check"—to make defendants liable to a third party of whom, at the time the statement was made, they had never heard, knew nothing, and when they had unqualifiedly refused to deal with any one except the party making the statement. No one would seriously contend that, if there had been a loss in this account, instead of a profit, upon the facts here set out the plaintiff could be held liable therefor. The method adopted by the plaintiff was a convenient one for taking whatever profit was made and escaping liability in case of loss.

The judgment appealed from should be reversed, and a new trial ordered, with costs to appellant to abide the event.

INGRAHAM J. I concur with Mr. Justice McLAUGHLIN, and I also think that the defendants were released by the payment to Carley of the sum of $1,048.54 which was received in full of all claims, demands, and causes of action, of every name and nature, "that I may have against said firm, or any member thereof, and particularly of and from any claim, demand, or causes of action that I may have against said firm growing out of any stock transactions which I have heretofore had with it, especially those represented by the several accounts kept in the names of Earle Carley, Earle Carley Special, Earle Carley Short Account, and Earle Carley No. 2; hereby ratifying and confirming all acts heretofore done by said firm in respect to the closing of the said several accounts with them and the sale and disposition of the various securities by them for the aforesaid several accounts."

The evidence is undisputed that Carley was conducting a speculation through the defendants' firm, that he had divided this speculation into several accounts, that he went to one of the defendants and said that he wanted to open another account as a trustee account, that the defendants refused to open a trustee account, and Carley told the defendants that he did not care what they called it, that defendant understood that it was not his account, but another man's account, but did not tell him whose account it was, he finally agreeing to designate it as No. 2 account, whereupon Carley ordered certain stocks to be purchased for this No. 2 account, and subsequently directed 100 shares of stock purchased for that account transferred to the special account. In opening this No. 2 account Carley delivered to the defendants a check drawn by the plaintiff to the order of Carley for $2,500. On the same day Carley received from the defendant the following receipt:

"November 21, 1900.
"Received from E. E. Carley a/c Special No. 2 a/c check of twenty-five hundred dollars.                    Raymond, Pynchon & Company.
                                        "[Signed] Paret."

Carley testified that he sent this receipt to the plaintiff, but on its face it shows that it was a receipt for an account opened in the name of Carley, and not for the plaintiff. It subsequently appeared that in consequence of the depreciation of the value of the stock the ac-

counts of Carley as a whole were not supported by a sufficient margin. The defendants, on notice to Carley, sold out all of the stocks carried for him upon which there was a balance of $1,048.54 due to Carley, and on December 31, 1900, this money was paid to Carley; Carley executing the release before mentioned.

Assuming that these defendants knew that Carley was carrying these stocks for another person, Carley was the authorized agent of that person to open and manage the account. He could have ordered the stocks sold, and he could have ratified the sale when made, and he was authorized to receive whatever money was due from the account when finally closed. By accepting the balance due on the accounts opened by him, he ratified the sale of the stock by the defendants and accepted the amount paid him as the correct amount due from the defendants to him, and, I think, released the defendants from any obligation to Carley or to the plaintiff on account of this speculation.

The judgment should be reversed, and a new trial ordered.