OPINION OF THE COURT
Mara T. Thorpe, J.
In this action, the plaintiff, a wholesale supplier of food to more than 20 nursing homes, seeks to recover $2,211.55, an amount representing the value of some food sold and delivered to the nursing home owned by the defendants between March, 1974 and March, 1977, for which the plaintiff was never paid. The defendants concede that they owe the plaintiff the sum sought, but counterclaim for $6,475 which the plaintiff overbilled the defendants during the same period. The case was submitted on stipulated facts.
Despite the defendants’ concession that the $2,211.55 is owed to the plaintiff, the first issue to be resolved is *975 whether the public policy of this State precludes plaintiff’s recovery in a civil action because of its willing participation in an overbilling-kickback scheme which enabled management personnel of the nursing home to defraud the State of New York of $3,459.60.
The agreed upon facts are as follows: Between March, 1974 and March, 1977, Leo Konstam, Benjamin Gelbtuch and Neil Ellman were respectively the general manager, comptroller and food manager of the New Sans Souci Nursing Home which was owned by the defendants Boruch Glouberman and Sol Mallow. In March, 1974, Konstam told the plaintiff’s president, Sam Frohlich, that he was the owner of the nursing home and had purchased it for his sons-in-law Gelbtuch and Ellman. Frohlich, who had sold food to the nursing home prior to the period in question, was further advised by either Konstam or Gelbtuch and Ellman that the plaintiff corporation would lose the nursing home’s business unless Frohlich participated in an overbilling-kickback arrangement. Frohlich agreed, and during the three years in question, the plaintiff delivered food to the nursing home, overbilled it, and, upon receipt of payment by nursing home check, returned the overage in cash to Gelbtuch and Ellman. The total amount overbilled during the three years was $9,934.60, $3,459.60 of which was reimbursed to the nursing home by the State of New York. Throughout the entire period, the defendant owners of the nursing home, Glouberman and Mallow, knew nothing of this scheme and derived no benefit from it. Gelbtuch and Ellman were convicted for their part in it on the testimony of Frohlich, who co-operated with the Special Prosecutor for Nursing Homes.
The law and public policy of New York are clear on the subject of contracts involving commercial bribery, kickbacks, and other forms of corruption. In Stone v Freeman (298 NY 268, 271), the court stated it is well settled that “a party to an illegal contract cannot ask a court of law to help him carry out his illegal object”. This principle was reaffirmed and extended in McConnell v Commonwealth Pictures Corp. (7 NY2d 465), where the court held that recovery could be barred even under a contract which in itself *976 was entirely legal, but where the course of performance of the contract by the plaintiff took an illegal form and the illegality was central to or á dominant part thereof.
Here, the agreement in March, 1974, that the .plaintiff continue to sell food to the nursing home was predicated upon Frohlich’s agreement to submit false bills to the nursing home for food delivered (in essence overbilling it) and to “kick back” in cash to the home’s operators that part of- the payment which did not reflect food actually delivered. According to the stipulated facts, both parts of the agreement were carried out from 1974 to March, 1977.
Although there may be nothing illegal per se about such an agreement between a vendor and the owner of a business, which Frohlich thought Konstam to be, or about the implementation of such an agreement,[1] as stated in People v Lerner (90 Misc 2d 513, 516 [where a vendor also submitted bills to a nursing home for goods never delivered and after receipt of payment therefor returned cash to the home’s operator]), “[w]ithout a doubt, a man of ordinary intelligence would realize, in these circumstances, that this is not conduct within the normal business practices.” Indeed, it was obviously so singular a business procedure as to put Frohlich on notice that the phoney bills probably, and in fact, were being utilized by the nursing home operators for a fraudulent purpose. A businessman of ordinary intelligence in Frohlich’s situation would infer that, at the least, there was a substantial chance that the false billings would be put to an illegal use. He cannot both fail to govern his conduct as if such fact existed, until he could ascertain its existence or nonexistence, and thereafter invoke the aid of the courts in recovering fruits of the arrangement when it turned out in fact to be tainted with illegality.
Thus, by willingly supplying false bills to the nursing home operators and being on notice that the bills he supplied might well be used for an illegal purpose, Frohlich’s conduct was tantamount to the crime of criminal facilitation (Penal Law, § 115.00), since reimbursement in *977 the amount of $3,459.60 was in fact feloniously[2] obtained from the State on the basis of the false bills.
For the foregoing reasons, the court has concluded that the agreement upon which the plaintiff seeks to recover was sufficiently permeated with fraud and illegality to bring this case within the spirit of Stone v Freeman (298 NY 268, supra) and McConnell v Commonwealth Pictures Corp. (7 NY2d 465, supra) if not their four corners. Accordingly, the court holds that the State’s public policy bars the plaintiff from recovery here.
The second issue to be resolved herein is whether the defendants may recover from the plaintiff the $6,475 difference between the amount overbilled and the amount reimbursed to the nursing home by the State of New York.
Under the facts as stipulated, Konstam, Gelbtuch and Ellman were employees of the defendants and, by holding Konstam out as the owner of the nursing home, were acting as undisclosed agents of the defendants in their dealings with the plaintiff. The three agents were in apparent possession of the nursing home, and no fact contained in this record suggests that Frohlich was on notice that any other principals existed.
It is the established rule that one who contracts with the agent of an undisclosed principal, supposing that the agent is the real party in interest and not being chargeable with notice of the existence of the principal, is entitled to set up against the principal any defenses and equities which he could have set up against the agent had he sued in his own behalf. (Foreign Trade Banking Corp. v Gerseta Corp., 237 NY 265.) In Gerseta Corp., where an undisclosed agent which was given possession of merchandise by the principal, sold the merchandise to a purchaser which thereafter sought to set off a prior debt of the agent to it against the undisclosed principal’s claim for payment for the merchandise, the Court of Appeals stated that if a third party, acting innocently and in good faith, has no notice or *978 knowledge sufficient to put him on inquiry about the agency and deals with the agent in reliance on his contract with the agent and the agent’s possession of the goods, the rights of the third party are not affected by the subsequent disclosure of the existence of the principal and the limitations on the authority of the agent.
The defendants argue that the plaintiff was not acting innocently or in good faith because of Frohlich’s willing participation in the overbilling-kickback scheme. However, in Gerseta Corp., the court made it clear that it was not speaking of the third party’s innocence vis-a-vis anyone other than the agent. It stated that as between agent and purchaser, where an undisclosed agent acts as principal and is in possession of the goods by virtue of action by the undisclosed principal, the purchaser who has no knowledge thereof “assume[s] the position of an innocent party dealing with the agent of an undisclosed principal.” (Foreign Trade Banking Corp. v Gerseta Corp., supra, p 273.) The situation in the instant case is analogous to that in Gerseta Corp. Since the defendant principals allowed the agents to run the nursing home and did not put the plaintiff on notice of their existence during the three years of continuous dealings between the plaintiff and the nursing home, the principals invested the agents with the indicia of property and thus placed them in a position to deceive the plaintiff about their true status. Therefore, the plaintiff must be held to have acted innocently vis-a-vis Konstam, Ellman and Gelbtuch.
The defense raised by the plaintiff against the defendant undisclosed principals here is that all of the differential between the value of the food actually delivered and the amount the plaintiff received due to the overbilling was returned in cash to Ellman and Gelbtuch. Payment made in good faith to the agent of an undisclosed principal by one who has dealt with him, supposing that he was acting for himself, is held to constitute a good defense as against the principal. (Ludwig v Gillespie, 105 NY 653; Larbig v Peck, 69 App Div 170; 3 NY Jur 2d, Agency, § 320; cf. Conklin v Raymond, 127 App Div 663.) While the court holds that the plaintiff was on notice that its false bills were being used for a fraudulent purpose, there is no evidence from the *979 stipulated facts that Frohlich knew or should have known that Konstam, Gelbtuch and Filman were acting on behalf of anyone other than Konstam. Therefore, the plaintiff has a valid defense to the defendant’s counterclaim based on his payments to the defendants’ agents, and the defendants cannot prevail on their counterclaim. Their remedy is an action against their agents, Konstam, Gelbtuch and Ell-man. (Conklin v Raymond, supra.)
For the foregoing reasons, the complaint is dismissed and judgment shall be for the plaintiff on the counterclaim.

. (But see 10 NYCRR 730.3 [c] [3], 414.16 [c] [3].)

. Obtaining reimbursement for false bills is conduct amounting to grand larceny in the second degree (Penal Law, § 155.35) and the offering of a false instrument for filing in the first degree (Penal Law, § 175.35), both felonies. (See People v Bel Air Equip. Corp., 46 AD2d 773, affd 39 NY2d 48.)