[No. 24168–1–I.   Division One.   August 27, 1990.]

AMTRUCK FACTORS, *Respondent*, v. INTERNATIONAL FOREST PRODUCTS, *Appellant.*

*Perkins Coie, John Dillow, J. Christian Moller,* and *Mark A. Ryan,* for appellant.

*Anderson & Hunter, Julian C. Dewell,* and *Aaron S. Okrent,* for respondent.

PEKELIS, J.—International Forest Products, Inc. (IFP) appeals from the trial court's dismissal of its counterclaims and from the granting of a directed verdict in favor of Amtruck Factors, Inc. (Amtruck) on its claim for payment of unpaid invoices. Amtruck cross–appeals from the trial court's rejection of certain exhibits and from the court's allowance of a setoff to IFP.

I

IFP remanufactures lumber products and sells them wholesale. IFP's main office is in Chino, California, and it has a branch office in Vancouver, Washington. When IFP first opened its Vancouver branch office, William McCoy was hired as branch manager. McCoy was responsible for buying lumber for IFP and for arranging for shipping and freight of the remanufactured lumber.

McCoy began using Amtruck to ship IFP's products in early 1980. Ingo Peterson acted as Amtruck's manager and was responsible for working out the details of Amtruck's agreements with IFP. Peterson testified that when he and McCoy first began doing business, the two discussed "rebates." In the shipping and freight industry, any profit over the projected profit margin is referred to as "cream." At that time, Amtruck's projected profit margin was 10 percent, and Peterson agreed that anything over Amtruck's

10 percent markup would be rebated to IFP. Peterson agreed to this arrangement with IFP in order to open up a north–south market for Amtruck.

Neither Amtruck nor IFP had rebate arrangements with any of its other business associates. IFP's controller, Tom March, testified that McCoy had authority to agree on freight prices, but did not have authority to enter into a rebate agreement. Any rebate agreement would need to be approved by the Chino office.

Charles Gerard, the majority shareholder of Amtruck, became aware of the rebate procedure sometime in the early part of 1980 during a meeting with Peterson and McCoy. According to Gerard, McCoy stated that the rebates were to be used to help support the Vancouver office, and that any excess would be sent to the Chino office. Gerard testified that the word "rebate" was used during this conversation. Gerard also testified that he contacted the Chino office at that time to verify that McCoy had complete authority to act on behalf of IFP. He was told that McCoy had complete control of the northend office and to deal with McCoy.

Peterson kept separate logs for the amounts actually billed to IFP and for the amounts disbursed as rebates. The rebate amounts did not appear on the freight bills sent by Amtruck to IFP, nor was there a follow–up invoice to indicate that rebates had been paid.

Amtruck did not have an established procedure for disbursement of the rebates. Peterson would simply send funds when McCoy requested payment. McCoy's requests for payment occasionally took the form of handwritten letters. Following are excerpts from these letters, all addressed to Peterson:

> Del, you and I have certainly been moving the loads.
> I must lay a heavy one on you. Between myself and our "partner" to South, I need $2800.00 by Friday the 25th. I should have at least 10/12 loads for you this week alone.
> . . . .
> Our partner needs $3000.00 down here by Monday Dec. 22. I told him I would ask you and see what we can work out.

. . . .
Could you please fire down $4500.00 for me to have for sure by Wed. A.M. Jan. 21st. I'm leaving for a big meeting in L.A. late evening the 21st and need to take it down with me.

. . . .
Thought I would let you know ahead again our money needs. Late Nov. 12 or early 13th will need $1100.00. Then by March 18th will need $4000.00 to send South.

Peterson testified that he believed McCoy was a partner and part–owner of IFP, and that he interpreted McCoy's references to "our partner' to South" as alluding to his partners in Los Angeles and Chino. He did not know why the word "partner" appeared in quotation marks. He was also unsure why McCoy referred to a "heavy one" or what McCoy meant by needing money to send south.

Peterson usually disbursed the funds by means of a Western Union cash money order. He claimed that because Western Union requires cash money orders to be made out to an individual, he made the money orders payable to McCoy personally. On four occasions, Amtruck sent checks rather than money orders to McCoy. These also were made out to McCoy personally.

At one point, Gerard asked Peterson about the possibility of stopping the payments to McCoy, but Peterson said that if the payments stopped McCoy would take IFP's business elsewhere. Gerard and Peterson also discussed the possibility that McCoy was pocketing the money and using it for personal expenses. The two concluded that McCoy was not using the money for personal expenses based on his shabby appearance and the fact that he drove an old car with bald tires.

Amtruck stopped making payments to McCoy in June 1982. About this time, IFP became delinquent on freight bills owed to Amtruck. Gerard initially contacted McCoy, but later contacted the Chino office when IFP's account remained delinquent. Personnel at the Chino office routinely referred him back to McCoy.

IFP discharged McCoy in March 1983 for failing to repay personal loans from IFP and IFP employees. The day

McCoy was discharged, he admitted he was taking kickbacks. IFP officials later met with Gerard and Peterson to discuss the situation. March, who was present at this meeting, testified that the payments Amtruck had made to McCoy were referred to as "cream" or "kickbacks," and that the term "rebate" was not used. March also testified that at the meeting, Peterson explained that he believed IFP partners had set up the arrangement as a scheme to avoid paying income taxes.

Shortly after this meeting, Amtruck filed a lawsuit against IFP seeking payment of its unpaid invoices. As a defense to this claim, IFP asserted that the agreements which formed the basis of Amtruck's complaint were unenforceable because they were procured through fraud. IFP also counterclaimed, alleging fraud and negligent misrepresentation, as well as other claims not at issue on appeal.

The case was tried to a jury. At trial, Amtruck's unpaid invoices were admitted into evidence. Also admitted was Amtruck's rebate log, which showed a total amount of $191,995 paid to McCoy.

At the conclusion of the trial, Amtruck moved to dismiss IFP's counterclaims, arguing that there was no evidence IFP had been damaged. The trial court granted the motion, stating that the measure of damages was "the amount of any unreasonable and unagreed to freight rates[,]" not the amount of kickbacks paid to McCoy. Reasoning that IFP had passed its freight costs on to its customers, the court concluded that IFP had suffered no loss and therefore dismissed IFP's counterclaims. Finally, the court ruled that IFP had failed to prove fraud or negligent misrepresentation as a matter of law.

Amtruck then moved for a directed verdict on its claim for payment of the unpaid invoices. Counsel for Amtruck stipulated that Amtruck's measure of damages for purposes of the motion was its cost plus a 10 percent markup. At trial, Amtruck had taken the position that the markup had ranged from 10 to 15 percent, and that it was entitled to recover this additional markup.

The trial court ruled that McCoy had apparent authority to agree to a "discount" and that IFP's freight agreements with Amtruck were not void for illegality. The trial court further ruled that Amtruck was limited to its cost plus a 10 percent markup, not only because counsel had so stipulated but because there was no evidence as to when the markup increased from 10 to 15 percent.

After the trial court ruled that McCoy had apparent authority to agree to a discount and that Amtruck could recover on its unpaid invoices, IFP requested an offset for rebates which Amtruck owed but had not yet paid to McCoy. The court granted IFP an offset for unpaid rebates. With the offset, Amtruck's total recovery was $25,688.61 plus interest.

## II

IFP contends that the trial court erred in dismissing its counterclaims for fraud and negligent misrepresentation. IFP first argues that the trial court erroneously ruled that the measure of damages was limited to the amount of any unreasonable and unagreed to charges. IFP contends that the proper measure of damages is the amount of the kickbacks paid to McCoy.

Generally, the measure of damages in fraud and misrepresentation cases is whatever losses were proximately caused by the fraud or misrepresentation. *Turner v. Enders,* 15 Wn. App. 875, 880, 552 P.2d 694 (1976). There do not appear to be any Washington cases which address the issue of the appropriate measure of damages in a kickback case. IFP relies on cases from other jurisdictions to support its contention that the measure of damages is the amount of the kickbacks.

In *Phillips Chem. Co. v. Morgan,* 440 So. 2d 1292 (Fla. Dist. Ct. App. 1983), a Phillips employee agreed to do business with a supplier in exchange for 50 percent of the supplier's profits. After the scheme was discovered, the supplier sued Phillips for payment of an unpaid bill and

Phillips counterclaimed. The court determined that Phillips was entitled to recover the amount of the kickbacks from the supplier, rejecting the supplier's argument that Phillips had failed to show any out–of–pocket loss. *Phillips Chemical,* 440 So. 2d at 1294. The court further determined that Phillips was entitled to recover the supplier's share of the ill–gotten profits, reasoning that the supplier should not be allowed to retain the fruits of its wrongful conduct. *Phillips Chemical,* 440 So. 2d at 1295.

Under similar facts, the court in *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.,* 734 S.W.2d 322, 326 (Tenn. 1987) likewise held that the measure of damages in a kickback case was the amount of the kickbacks. The court reasoned that the company whose employee had received kickbacks had been damaged by paying more and receiving less in the precise amount of the kickbacks. Had the supplier not paid kickbacks to the employee, that amount would have inured to the benefit of the defrauded company in the form of lower prices or higher rebates to it. *Dorsett Carpet,* 734 P.2d at 326.

We agree with the rationale of these cases and hold that it is not necessary to show out–of–pocket loss in order to prove damages where a kickback scheme is alleged. As the courts in *Phillips Chemical* and *Dorsett Carpet* recognized, a business whose employees receive kickbacks suffers hidden economic losses. When a supplier of goods or services pays kickbacks in order to retain a customer's business, it is apparent that the supplier is willing to do the job for less than the amount actually billed to the customer. Whether or not the price paid by the customer is commercially reasonable, the customer suffers actual damage in the amount of the kickbacks paid to its employee by the supplier.

Thus, we hold that the trial court erred in limiting the measure of damages to the amount of any unreasonable and unagreed to freight charges and in dismissing IFP's

counterclaims on this basis. The proper measure of damages where a kickback scheme is proven is the amount of kickbacks paid.

We further hold that this measure of damages applies to both fraud and negligent misrepresentation claims. While we recognize that cases such as *Phillips Chemical* and *Dorsett Carpet* involve intentional rather than negligent participation in a kickback scheme, we see no reason to treat a supplier who negligently pays kickbacks to a customer's employee differently from one who intentionally does so. In either case, the actual economic damage to the customer is the same: the amount of the kickbacks.

### III

The trial court also based its dismissal of IFP's fraud and negligent misrepresentation claims on its determination that there was insufficient evidence to send these claims to the jury. IFP assigns error to this ruling.

In ruling on a motion for a directed verdict and dismissal of a claim, the evidence must be viewed in the light most favorable to the nonmoving party. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 73, 684 P.2d 692 (1984). The motion should be granted only if there is no evidence or reasonable inferences therefrom which would sustain a jury verdict in favor of the nonmoving party. *Davis*, 102 Wn.2d at 73; *Levy v. North Am. Co. for Life and Health Ins.*, 90 Wn.2d 846, 851, 586 P.2d 845 (1978).

We first address the question of whether there was sufficient evidence to send IFP's fraud claim to the jury. Common law fraud must be proven by clear, cogent and convincing evidence and may consist of either intentional misrepresentation of a material fact or concealment where there is a duty to disclose. *Haberman v. WPPSS*, 109 Wn.2d 107, 166–68, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed*, 488 U.S. 805 (1988); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 Wn. App. 456, 463, 656 P.2d 1089 (1982). A duty to disclose may arise where one party

has special knowledge of material facts to which the other party does not have access. *Haberman,* 109 Wn.2d at 166–67; *Tokarz,* 33 Wn. App. at 459.

IFP's fraud claim is based on Amtruck's alleged failure to disclose that McCoy was receiving kickbacks. In order to establish fraud based on a failure to disclose, IFP must show that Amtruck had special knowledge of facts to which IFP did not have access. *See Tokarz,* 33 Wn. App. at 459. Amtruck's argument that the fraud claim fails because *McCoy* knew of the rebates misses the point. The issue is whether the evidence is sufficient to allow a jury to find that *Amtruck* knew McCoy was in fact receiving "kickbacks", not "rebates" on behalf of IFP, and that IFP had no knowledge of this.

Viewing the evidence, as we must, in the light most favorable to IFP, we conclude that IFP presented sufficient evidence from which a jury could have found that Amtruck acted fraudulently. A jury could reasonably infer from the evidence that Amtruck actively participated in a fraudulent kickback scheme. This evidence includes the nature and content of the letters from McCoy to Peterson, the fact that Peterson remitted the payments to McCoy personally while the billing invoices were sent directly to IFP, the undisputed fact that Peterson kept separate logs for the amounts actually billed to IFP and the amounts disbursed as rebates to McCoy, and, finally, the fact that Peterson never provided IFP with an accounting of rebates paid.

This evidence does not *oblige* a jury to find that Amtruck acted fraudulently. However, we cannot conclude that there is no evidence which would sustain a jury verdict in IFP's favor. *See Davis,* 102 Wn.2d at 73. Thus, the trial court erred in dismissing the fraud claim for insufficient evidence.

IFP's negligent misrepresentation claim is based on much the same evidence as that supporting the fraud claim. From this evidence, IFP contends that a jury could find that Amtruck negligently failed to disclose material facts to IFP. We agree.

█ The elements of negligent misrepresentation are (1) a false statement (2) made to induce a business transaction (3) upon which the other party justifiably relies. *Controlled Atmosphere, Inc. v. Branom Instrument Co.,* 50 Wn. App. 343, 350–51, 748 P.2d 686 (1988); *Haberman v. WPPSS,* 109 Wn.2d 107, 161–62, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed,* 488 U.S. 805 (1988).[1] Just as the first element of fraud may be satisfied by omission of a material fact, we see no reason why an omission may not also satisfy the first element of negligent misrepresentation. Thus, we hold first that negligent omission of a material fact is sufficient to satisfy the first element of negligent misrepresentation.

█ As with IFP's fraud claim, we also conclude that there is a jury question as to whether Amtruck negligently failed to disclose to IFP the existence of its agreement with McCoy. Apart from the facts discussed above, there is the additional fact that although Gerard and Peterson admitted they suspected McCoy was pocketing the payments, they failed to verify that IFP knew the payments were being made directly to McCoy. In fact, they continued to make the payments to McCoy because they were afraid McCoy would take IFP's business elsewhere if they stopped.

In summary, the trial court erred in dismissing IFP's counterclaims. The trial court both misperceived the appropriate measure of damages and failed to recognize that IFP had made out prima facie cases of fraud and negligent misrepresentation.

---

[1]Amtruck contends that the existence of a sale is an element of negligent misrepresentation, and that IFP's negligent misrepresentation claim must fail as a matter of law since no sale took place. In *Haberman,* however, the court held that WPPSS bondholders could bring negligent misrepresentation claims against accountants and other professionals who prepared misleading reports on behalf of WPPSS, reasoning that the professionals had reason to know bondholders would rely on the reports. *Haberman,* 109 Wn.2d at 162–63. The court analyzed negligent misrepresentation in terms of supplying "false information for the guidance of others in their business transactions," not in terms of a "sale." *Haberman,* 109 Wn.2d at 162. Thus, it is apparent that the existence of a sale is not an element of negligent misrepresentation.

## IV

IFP also assigns error to the trial court's directed verdict for Amtruck on its claim for payment of unpaid invoices. The trial court reasoned that McCoy had actual and apparent authority to enter into freight agreements and apparent authority to agree to a "discount". IFP contends that Amtruck is not entitled to payment because McCoy acted outside the scope of his authority when he made the rebate agreement with Peterson. IFP also argues that the facts known to Amtruck imposed an affirmative duty to inquire into the extent of McCoy's authority and that Amtruck's failure to inquire precludes it from recovering on its unpaid invoices.

An agent has apparent authority to act on behalf of his principal when the principal's conduct would lead a reasonable person to believe that the agent had authority to act. *Schoonover v. Carpet World, Inc.,* 91 Wn.2d 173, 176–77, 588 P.2d 729 (1978) (quoting *Lumber Mart Co. v. Buchanan,* 69 Wn.2d 658, 662, 419 P.2d 1002 (1966)). Reliance on the agent's authority must be justifiable. *Glendale Realty, Inc. v. Johnson,* 6 Wn. App. 752, 756, 495 P.2d 1375 (1972). One dealing with an agent is not entitled to rely on the agent's representations when put on notice that a question exists as to the agent's authority. *Glendale,* 6 Wn. App. at 756. On the other hand, a party dealing in good faith with an agent who appears to be acting within the scope of his authority is not bound by undisclosed limitations on the agent's power. *Walker v. Pacific Mobile Homes, Inc.,* 68 Wn.2d 347, 351, 413 P.2d 3 (1966).

Gerard asserts that when he first became aware of the payments to McCoy, he called IFP's main office in Chino to verify the scope of McCoy's authority. He testified that "we didn't get very far in the conversation," and that Chino personnel consistently referred him back to McCoy at the Vancouver office. Amtruck argues that under these circumstances it was entitled to rely on McCoy's apparent authority to enter into rebate agreements. We disagree.

■ First, although Gerard's and Peterson's version of what McCoy told them was not directly controverted,[2] the jury was not required to believe their testimony. Moreover, a jury could reasonably infer from McCoy's letters alone that any assertion of authority by McCoy was so clearly false that Amtruck had no right to rely on it. Moreover, as IFP points out, Peterson and Gerard continued to send checks and money orders made out to McCoy personally even after they discussed the possibility that he was pocketing the money. One dealing with an agent is not entitled to rely on the agent's representations when put on notice that a question exists as to the agent's authority. *Glendale*, 6 Wn. App. at 756. Under these circumstances, it is for the jury to resolve the issue of the reasonableness of Amtruck's reliance.

Although the parties and the trial court placed great emphasis on the issue of McCoy's apparent authority to enter into a rebate agreement with Amtruck, we believe the agency issue is logically interwoven with the issues presented in IFP's counterclaims for fraud and negligent misrepresentation. In resolving the issue of whether Amtruck acted fraudulently or negligently, the trier of fact will also be determining whether Amtruck knew or should have known that McCoy was in fact taking kickbacks for himself rather than accepting rebates as an agent for IFP. Thus, the jury's resolution of IFP's fraud and negligent misrepresentation claims will effectively resolve the question of McCoy's apparent authority.

Again, viewing the evidence in the light most favorable to IFP, we cannot conclude that there is no evidence which would support a jury verdict in favor of IFP. *See Davis,* 102 Wn.2d at 73. A jury question exists as to whether Amtruck was on notice of McCoy's improper conduct and as to whether Amtruck justifiably relied on McCoy's representations that he had authority to accept the payments.

---

[2]McCoy faced criminal charges and elected to exercise his Fifth Amendment right to remain silent.

# V

IFP next contends that the trial court erred in its ruling that the freight agreements themselves were not void for illegality. We address this issue in the event the jury finds that Amtruck participated in a kickback scheme.

It appears undisputed that if the jury determines that Amtruck participated in an illegal kickback scheme, the kickback portion of the agreement, being illegal, would be unenforceable. The only remaining issue would be whether the freight agreements were severable from the kickback scheme.

The trial court relied on *Haberman v. Elledge,* 42 Wn. App. 744, 713 P.2d 746 (1986) for its ruling that the freight agreements could not be void for illegality. However, the trial court's reliance on *Haberman* is misplaced. *Haberman* stands for the proposition that, in contrast to a contract which violates an express statutory policy, a contract which violates a business regulation is not void unless made so by the terms of the statute. *Haberman,* 42 Wn. App. at 750. This analysis would apply if IFP were challenging the legality of the freight agreements per se. Here, however, the issue is whether the kickback scheme, assuming one were proven, so taints the freight agreements that even the latter are unenforceable. Thus, the issue is not whether the *freight* agreements are illegal; rather, it is whether the existence of an illegal kickback scheme renders the freight agreements void and unenforceable.[3]

---

[3]Resolution of that question will turn on a separate analysis. Courts will not enforce a contract if it is illegal or grows immediately out of and is connected with an illegal act. *Golberg v. Sanglier,* 96 Wn.2d 874, 879, 639 P.2d 1347, 647 P.2d 489 (1982). In *Sherwood & Roberts–Yakima, Inc. v. Cohan,* 2 Wn. App. 703, 710, 469 P.2d 574 (1970), the court held that a contract which is not itself illegal may be enforced if it is severable from the illegal transaction. The court then set out a number of factors to consider in determining whether the agreement to be enforced is sufficiently remote from the illegal transaction. *See Sherwood,* 2 Wn. App. at 713–14.

Although the issue has not been directly addressed by our courts, we note that courts from other jurisdictions have held that a supplier's intentional participation in a kickback scheme renders agreements arising out of the scheme void for illegality and serves as a complete defense to the supplier's claim on an unpaid

Here too, the issue of whether the freight agreements are enforceable is inextricably intertwined with IFP's counterclaims against Amtruck. Until the jury has resolved the issue of whether Amtruck participated, either intentionally or negligently, in an illegal kickback scheme, the question of whether the freight agreements are void for illegality cannot be resolved.

## VI

On cross appeal, Amtruck contends that the trial court erred in allowing IFP a setoff for unpaid rebates. Amtruck argues that IFP is precluded from claiming a setoff because this claim is inconsistent with IFP's theory that the payments were illegal kickbacks. IFP responds that it is free to claim a setoff for unpaid rebates in the face of the trial court's rejection of its theory of the case.

Depending upon the jury's resolution of IFP's counterclaims, this issue may not arise on remand. Because we do not need to resolve it and because the issue is not well briefed by the parties, we decline to address it here.

Also on cross appeal, Amtruck contends that the trial court erred in refusing to admit into evidence certain charts prepared by Gerard. These charts recalculated the amount due on Amtruck's invoices using a 13 to 15 percent markup. Relying on the charts, Amtruck argues that the trial court erred in limiting its recovery to cost plus a 10 percent markup. Amtruck also argues that the charts showed it had overpaid IFP, asserting that the rebates paid to McCoy failed to account for periodic increases in the original markup of 10 percent. Amtruck argues that since IFP was claiming the amount of the rebates paid as damages, any damages to IFP should be reduced by the amount of the asserted overpayment.

■ We conclude that the trial court properly rejected the charts. The exhibits were prepared by Gerard, who testified at trial that he was not involved in determining

bill. *Phillips Chemical,* 440 So. 2d at 1296; *Frohlich & Newell Foods, Inc. v. New Sans Souci Nursing Home,* 109 Misc. 2d 974, 441 N.Y.S.2d 335, 338 (1981).

rebate amounts or markups, but left these responsibilities to Peterson. Therefore, Gerard was not competent to testify regarding the timing and amount of markups agreed to by McCoy and Peterson. Thus, although the exhibits would have been relevant, the necessary foundation was lacking here. *See State v. Coleman,* 19 Wn. App. 549, 553, 576 P.2d 925 (1978) (foundation evidence required before evidence admissible on a particular issue).[4]

Reversed and remanded.

COLEMAN, C.J., and SCHOLFIELD, J., concur.

Review denied at 116 Wn.2d 1003 (1991).

---

[4]IFP also points out that Amtruck stipulated to a 10 percent markup for purposes of its motion for a directed verdict. However, Amtruck is not bound by this stipulation on remand. If the jury's verdict entitles Amtruck to recover on its unpaid invoices, Amtruck is free to relitigate the amount due it.