[No. 13043.   Department Two.   March 24, 1916.]

E. A. KITZMILLER et al., Respondents, v. PACIFIC COAST & NORWAY PACKING COMPANY et al., Appellants.[1]

CORPORATIONS—REPRESENTATION—AUTHORITY OF GENERAL MANAGER. The "general manager" of a corporation in apparent charge of its business of catching, canning, and selling salmon, without any limitations or restrictions as to his express authority, has implied authority to do whatever the corporation could do in the general scope of its business, including the employment of brokers to sell its products.

SAME—GENERAL MANAGER—IMPLIED AUTHORITY. Where the general manager of a corporation engaged in catching, canning, and selling salmon, had sold salmon and employed brokers therefor while manager of a branch office, his contract with brokers to sell 10,000 cases in advance of the opening market price, at about the then current price, is not so unusual in its terms as to be beyond his implied authority as a general manager, he having apparent authority to exercise his judgment in the matter.

Appeal from a judgment of the superior court for King county, Smith, J., entered April 27, 1915, upon findings in favor of the plaintiffs, in an action to recover a broker's commission, tried to the court.   Affirmed.

Winfield R. Smith, for appellants.

Bronson, Robinson & Jones, for respondents.

HOLCOMB, J.—Respondents sued and recovered upon a broker's commission for services performed in selling 10,000 cases of canned salmon, upon a contract made with defendant corporation through its general manager, Joseph Kildall. The salmon was never delivered.   Appellants' claims of error are grounded upon two general propositions, viz.: (1) Kildall had no express or implied authority; (2) the contract was unusual in its terms and without precedent.   The arguments are elaborate, but the facts are plain and the issues are simple.

The Pacific Coast & Norway Packing Company, for several years prior to January, 1914, was a corporation en-

gaged in catching, canning, and selling salmon in Alaska. Its producing plants were located at two places in Alaska, and it had a general office in Seattle, and apparently had some corporate office in Minneapolis, Minnesota. In January, 1914, at a meeting of the company held in Minneapolis, Joseph Kildall was elected general manager of the company. He was also secretary of the company and had previously been designated as Seattle manager in charge of the company's office at Seattle. He had been associated with the company for a long period of years, having had the management of the Seattle office as far back as 1901. His authority as general manager was not specifically limited by any instructions given at the time of his election or otherwise shown. He was also one of the directors of the company. Apparently all matters of general management of the company's business were left to him.

In February, 1914, Kildall went to Pittsburgh for the purpose of securing tin plate with which to manufacture the cans to contain the ensuing season's pack of salmon, and also to borrow money to finance the year's business. He negotiated with the Phillips Sheet & Tin Plate Company of Weirton, West Virginia, to purchase the tin plate, and proposed to it that, if it would furnish the tin, his company would arrange to meet the payments on it by shipping the first 10,-000 cases of the coming season's pack of early fish, to be ready in the latter part of July and the early part of August, on orders of P. Duff & Sons, with instructions to the latter to pay the proceeds of the 10,000 cases, as they came in, directly to the tin plate company. Respondents were not buyers, but were merely brokers making sales for commissions.

The arrangement proposed by Kildall to the tin plate company was first approved by the general sales manager, and in pursuance thereof Kildall gave the company its order for its tin plate requirements by a letter executed in triplicate on February 11, 1914, and accepted by the tin plate company. One of the provisions was that the arrangement was

made upon the understanding that Kildall's company would ship large quantities of salmon to the respondents and would instruct them to meet the payments therefor out of proceeds of the first shipments. Shipments were to be made the latter part of July and the early part of August, which would be before the naming of the opening prices of salmon by the Alaska Packers Association. The opening prices of salmon were generally fixed about August 20 to 25 of each year. The terms of the sale of the salmon were not then agreed upon, as Mr. Kildall desired to go on to New York to investigate the market prospects. On February 12, respondents wrote Kildall's company at Seattle as follows:

"We had the pleasure of having your Mr. Kildall here for the past three days, and while here he made purchase of approximately 7,000 boxes of tin plate, according to the specifications handed Mr. Watson of the Phillips Sheet & Tin Plate Company, with the understanding that you are to ship to us, on our orders, sufficient salmon to cover the amount of the purchase, as detailed in a copy of letter we have today written to the Phillips Sheet & Tin Plate Co., Weirton, W. Va. No doubt Mr. Kildall has advised you of this."

The letter of February 12 to the tin plate company, referred to, set out the understanding of respondents substantially as above detailed, stating further that they understood that Kildall would issue notes of the Pacific Coast & Norway Packing Company with his own personal indorsement to cover the value of the tin plate, and would ship to them on their orders sufficient salmon to cover the amount of these notes, the proceeds to be sent direct to the tin plate company. The tin plate company, without notice to respondents, immediately opened negotiations with Balfour, Guthrie & Company, their Pacific Coast agents, to have the latter guarantee the tin plate account, as the tin plate company was not in the business of financing matters of this kind. Balfour, Guthrie & Company at first refused to do so, because the appellants owed them a balance of about $7,000 on the previous year,

and therefore, on February 27, the tin plate company notified Kildall, then in Boston, that as their Pacific Coast agents, Balfour, Guthrie & Company, would not guarantee the account, he would have to make further arrangements before they would fill his order for the tin.

The tin plate company did not send any notice to the respondents of its procedure. Kildall, while in New York, succeeded in borrowing the sum of $25,000, out of which he arranged to pay the account due Balfour, Guthrie & Company, and after this arrangement was communicated to the latter, they wrote the tin plate company on March 25, saying that, on condition the account was paid in ten days, they would guarantee payment on the part of the packing company of the tin plate contract of February 11. Later, on April 13, Balfour, Guthrie & Company made their guaranty absolute. The tin plate company's concern was for fear the packing company would not make the shipments of salmon agreed upon, and it was to guard against loss from this source that it required the guaranty. Kildall remained in the east several weeks after his first visit to respondents at Pittsburgh, investigating the situation as to prospects of the salmon market and market prices in the east.

On the very day when negotiations by the tin plate company with Balfour, Guthrie & Company resulted in the guaranty by the latter, a further conference was held between Kildall and Mr. Watson, of the tin plate company, and respondents, and Mr. Watson made the point that his company could not know that plaintiffs could sell the salmon unless there was some fixed price named. In order to have the matter go through, Mr. Kildall agreed to ship the first 10,000 cases of salmon upon the fixed price of sixty-five cents per dozen cans, which would net approximately the full amount of the tin plate. The fish was to be packed and shipped from the early pack in July prior to the fixing of the opening prices by the association. Respondents were to take orders for 5,000 cases first, and then notify Kildall and receive additional authority

before disposing of the other 5,000 cases, and this they did. Respondents at all times refused to guarantee the tin plate company's account, although agreeing to remit the proceeds from the sales of the salmon direct to the tin plate company to meet the packing company's notes, and to assist the packing company in any way that they could towards getting the tin plate delivered as rapidly as possible. The price agreed upon for the salmon was made after a thorough canvass of the market conditions and prospects. It was fixed at sixty-five cents per dozen cans, price guaranteed against opening prices. Just what this guaranty amounted to was the subject of some discussion later between respondents and Kildall. Letters passed between them subsequently which apparently definitely fixed the agreement as to this point. Respondents negotiated sales for the first 5,000 cases of salmon, sent their orders therefor to the packing company at Seattle, telegraphed Kildall at Minneapolis for authority to proceed with the sale of the second 5,000 cases, which was given him on March 30, and the packing company at Seattle, through Mr. Kildall, subsequently acknowledged the orders for all the 10,000 cases as having been received by it. The tin plate company, as late as August 8, 1914, notified respondents that, in accordance with the arrangement, it was expecting them to look after the payments on the notes given by the packing company from the proceeds of the sale of the salmon.

On April 8, as shown by the minutes of the meeting of the directors of the defendant company, Kildall reported the arrangement whereby he secured the tin plate for which he gave the company's notes, and in connection therewith agreed to sell the 10,000 cases of salmon through respondents, as brokers, for early shipment before the naming of the opening prices, at sixty-five cents per dozen, the proceeds of such sale to be applied to the payment of the tin plate notes. This action was unanimously approved by the board. Subsequently Kildall was removed as general manager and the management of the company was given to one E. Schoenwald, and

Schoenwald, on August 27, on the part of the packing company, refused to carry out its contract with respondents.

It is claimed by appellants, that the sale of the salmon in advance at a price of sixty-five cents was at a very great loss; that if Kildall had any authority whatever to sell the salmon in advance, it should have been sold only subject to opening prices on or about August 20 of the current year as was customary, and not guaranteed against lower opening prices.

I.   That Kildall had no express or implied authority to enter into the transaction complained of cannot be sustained upon reason or authority.   As "general manager" without any limitations or restrictions as to his express authority, he had implied authority to do anything that the corporation could lawfully do in the general scope of its business. *Harvey v. Sparks Brothers*, 45 Wash. 578, 88 Pac. 1108; *Saunders v. United States Marble Co.*, 25 Wash. 475, 65 Pac. 782; *Chilcott v. Washington State Colonization Co.*, 45 Wash. 148, 88 Pac. 113; *Citizens' Nat. Bank of Tacoma v. Wintler*, 14 Wash. 558, 45 Pac. 38, 53 Am. St. 890; *Waldron v. Canadian Pac. R. Co.*, 22 Wash. 253, 60 Pac. 653.   It assuredly was as much the corporate business of the company to sell as to catch and pack its products.

II.   Nor is there any support for the assertion that, because the contract was unusual in its terms and without precedent, it was beyond the express or implied authority of the general manager.   *Camacho v. Hamilton Bank-Note & Engraving Co.*, 2 App. Div. 369, 37 N. Y. Supp. 725, is cited to the effect that no presumption of law can be indulged in that, because a person acts as general manager, he has the power to bind his principal to contracts of an extraordinary nature; upon which principle a contract by a general manager employing an agent for an unusual length of time—three years—was held unauthorized; citing, also, *Carney v. New York Life Ins. Co.*, 162 N. Y. 453, 57 N. E. 78, 76 Am. St. 347, 49 L. R. A. 471; *Hyde v. Larkin*, 35 Mo. App. 365; *Baird Lumber Co. v. Devlin*, 124 Ala. 245, 27 South. 425;

*Northwestern Packing Co. v. Whitney,* 5 Cal. App. 105, 89 Pac. 981.

But upon a similar proposition; we held in *Slocum v. Seattle Taxicab Co.,* 67 Wash. 220, 121 Pac. 67, 39 L. R. A. (N. S.) 435, that where the superintendent of a company, having authority to employ and discharge such men as were needed about its business but only from day to day, and not authorized to enter into a written contract without the knowledge of the president, who was the only one authorized so to contract, executed an agreement with another engaging him, among other provisions, to do the company's work for a period of one year, the agreement was made in the course of the superintendent's or manager's apparent authority; and in *Brace v. Northern Pac. R. Co.,* 63 Wash. 417, 115 Pac. 841, 38 L. R. A. (N. S.) 1135, we held that the superintendent of the defendant corporation's dining car system had apparent authority to enter into a contract for the furnishing of menu cards with elaborate and fancy devices for the company's use and bind the company by his contract therefor. Analogous cases may be found in the following: *Alston v. Broadus Cotton Mill,* 152 Ala. 552, 44 South. 654; *Milledgeville Water Co. v. Edwards,* 121 Ga. 555, 49 S. E. 621; *Lewisville Light & Water Co. v. Lester,* 109 Ark. 545, 160 S. W. 861; *Law Reporting Co. v. Elwood Grain Co.,* 135 Mo. App. 10, 115 S. W. 475; *Manross v. Uncle Sam Oil Co.,* 88 Kan. 237, 128 Pac. 385, Ann. Cas. 1914 B. 827; *Edwards v. Plains Light & Water Co.,* 49 Mont. 535, 143 Pac. 962; *Jenkins Steamship Co. v. Preston,* 186 Fed. 609.

In the last case cited, it was held that the general manager of a steamship company has apparent authority and can bind the company by a contract employing the master of a vessel for two seasons, though employment of masters for more than one season is not customary. Appellants also cite *Gregory v. Loose,* 19 Wash. 599, 54 Pac. 33, quoting as follows:

"It is well settled in the law of agency that the extent of implied authority is limited to acts of a *like kind* with those

from which it is implied, and that an implied power is never extended by construction beyond the obvious purpose for which it is granted."

From this it is inferred by appellants that, because Kildall had never sold 10,000 cases of salmon at one time in advance of the catching and packing of the salmon, at sixty-five cents per dozen cans, he never had performed an act of a like kind. But it is shown by the evidence that Kildall had, while acting only as Seattle manager, whatever his authority there might have been, sold salmon, and had at other times employed respondents as brokers therefor. It certainly is not an unusual thing for any kind of producer to sell his products in advance of their production. Merchandise may be, and often is, sold in advance of its manufacture or production, and sometimes at a firm or fixed price and sometimes at a variable future price. It is known of all men that wheat growers sell wheat before it is ready for market; that horticulturists sell fruit before it is produced; and at times their sales are made on future prices as fixed by the market, and at times their products are sold for a present price. Whether it is better to sell at a fixed or firm price or at a variable future price depends chiefly upon the judgment and the condition of the seller. Kildall, as general manager, had apparent authority to exercise his judgment in the matter. It is shown in this case that, at the time Kildall sold the salmon in advance, salmon was selling at about the price at which he sold, and that there were large quantities of the previous year's production of canned salmon still unsold. It is contended by appellants that, at that time, the prospect for the market price for the future pack of salmon was the brightest that it had been in years. But we find nothing to justify this contention in the evidence, and can only find evidence that, at that time, the existing salmon in the market was selling for from sixty to sixty-five cents per dozen. Later, by some months, the prospects for the market of salmon for 1914 suddenly became very bright, and the price fixed at the opening of the market on August

28 of that year was ninety cents. But there was nothing at the time the sale was made, except the most sanguine hopes, to indicate that the market would open in 1914 at ninety cents or better.

Respondents fully performed their contract and are entitled to recover. The judgment is affirmed.

MORRIS, C. J., MAIN, BAUSMAN, and PARKER, JJ., concur.