[No. 13270-2-II.   Division Two.   November 4, 1991.]

GERALD O. SMITH, *Plaintiff*, v. HANSEN, HANSEN & JOHN-
SON, INC., *Respondent*, FENTRON BUILDING
PRODUCTS, INC., *Appellant*.

*Robert C. Kelley* and *Oseran, Hahn, Van Valin & Watts, P.S.*, for appellant.

*F. Mike Shaffer* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*, for respondent.

MORGAN, J. — The owner of a building hired Hansen, Hansen & Johnson, Inc. (HH&J) to renovate it.[1] The renovation included design and construction of an exterior glass wall. A year or so after the new wall was finished, it began to leak. The owner of the building sought redress from HH&J, which settled with the owner for $81,000. HH&J then sued Fentron, a corporation in the business of designing and installing glass walls. HH&J sought reimbursement plus other damages. The trial court awarded damages, but we reverse.

In 1982, Lee Hansen was an architect and partner in HH&J. He was acquainted with Everett Foster socially and through Foster's former position as mayor of Sumner, Washington. Hansen also knew that Foster was employed by Fentron. Hansen trusted Foster "based on their past acquaintanceship and on Foster's status as a manager of Fentron." Finding of fact 1.

Fentron employed Everett Foster as a "manager of manufacturing services". Fentron furnished Foster with business cards, an office and a telephone. Foster's duties included purchasing material needed for manufacturing, but did not include selling products to customers. He was employed in the manufacturing department, and sales to customers were handled through the sales department.

Overall, Hansen talked with Foster an estimated 6 to 10 times. Some of these conversations were in person at

---

[1]There are actually two entities with the name Hansen, Hansen & Johnson. One is a partnership of architects; the other is an incorporated building construction firm. The two have been aligned at all times in this case, and for convenience we will refer to them collectively.

HH&J's offices; others were by telephone. When Hansen called Foster, he did it by dialing Fentron's telephone number and going through Fentron's switchboard. Hansen never visited Fentron's offices, and no Fentron letterhead or documents were used in connection with their discussions.

In 1982, Foster visited Hansen at HH&J's offices. At this time, HH&J was the general contractor for construction of the Tacoma Dome Hotel, and Foster's purpose was to solicit sales for Fentron products and services in the construction of the hotel. In the course of the conversation Foster told Hansen that Fentron had salvage glass available and was trying to find a use for it. During this visit or at a later time, Foster "presented his business card showing that he was a manager of Fentron's manufacturing services division." Finding of fact 5. Foster led Hansen to believe that Foster had authority to sell materials on behalf of Fentron, but in fact Foster's efforts were unknown to Fentron and contrary to its policies and direction.[2]

---

[2]In finding of fact 31, the trial court stated, "Fentron knew that Foster had attempted to use his contacts in Pierce County to obtain subcontract bids from HH&J on the Tacoma Dome Hotel." As Fentron argues, however, this finding is not supported by substantial evidence. Robert Hess, Fentron's vice-president, testified that early in Foster's employment, he and Foster had a hallway conversation in which Foster said

that he had some contacts in Tacoma because of his past experience there, and he really wanted to help the company get the Tacoma Dome Hotel. I said, Everett, I have this conversation with practically every new employee that they think they know somebody who is going to do something. Our policy is to flow all of these things through the sales department. We are happy to have what information you have. Your job is to go see Mr. Dick Hatala and turn it over to him. As far as I know, he did that because I didn't hear any more about it.

Q: Well, you did hear more about the Tacoma Dome Hotel because you placed it on your own list of important jobs, is that right?

A: It was routinely listed as a possible job on a monthly report which we generated, but beyond that, I didn't personally hear any more about it from Everett Foster.

Although HH&J implies otherwise, there is no testimony or inference that Hess knew of Foster's contacts with HH&J, or that there was a connection between Foster's contacts with HH&J and Fentron's inclusion of the Tacoma Dome Hotel on its list of potential projects. Report of Proceedings, at 270-72.

Later, apparently in late 1982, Hansen called Foster at Fentron and inquired about salvage glass. Foster called back later and indicated that certain salvage glass, hereinafter called the ARCO glass, was available. In effect, Foster offered to sell the ARCO glass to HH&J at a reduced price, so that HH&J could use it on the 1111 Fawcett Building, the Tacoma office building that HH&J had been asked to renovate. Foster ostensibly made the offer on behalf of Fentron. The offer was oral, and HH&J did not request a written quotation from either Foster or Fentron. Foster told Hansen that the glass had been rejected from Fentron's ARCO project in Anchorage only because of its color, when in fact Fentron had rejected the glass for other manufacturing deficiencies.[3]

HH&J accepted the offer on a date that is not clear from the evidence or findings.[4] HH&J accepted because it believed it was dealing with Fentron. It would not have accepted had it known it was dealing with Foster individually.

Apparently after the offer was accepted,[5] a man named Al Kapp drew up plans showing how the glass was to be installed in the 1111 Fawcett Building. Kapp was a Fentron employee who had actual authority to provide general designs on Fentron's behalf at the request of his supervisors.[6] However, Kapp was not acting at the request of a

---

[3]At the time of Foster's representations, the ARCO glass was owned by Fentron. Foster, however, contrary to his authority and without Fentron's knowledge, had sold it to Pacific Iron & Metal (Pacific) and then pocketed the proceeds. Apparently this sale to Pacific was in about October 1982. Pacific operated a scrapyard, and Foster had caused 28 large crates of the glass to be trucked there. From then until HH&J acquired it, the glass was physically located at Pacific's scrapyard.

[4]There is no finding concerning the date of acceptance, and due to the informal way in which the parties dealt, the evidence is unclear as to that fact.

[5]Again, the evidence and findings are unclear as to date.

[6]Kapp was a designer employed to develop conceptual drawings that Fentron's customers could use in the bidding process. Once Fentron actually had a contract, engineers would take over.

supervisor, and the plans did not bear Fentron's name, mark or logo. Instead, Kapp was acting at Foster's request, and without Fentron's knowledge or authority.

Foster or Kapp[7] submitted the plans to HH&J on February 4, 11, and 15, 1983. HH&J used the plans to install the glass, and installation started sometime after February 16. All installation work was done by non-Fentron employees hired by Foster. During construction, Foster delivered to HH&J glass, aluminum, sealants, gaskets and other materials which belonged to Fentron, and he placed orders with Fentron "to be delivered to HH&J, for installation,[8] sealants and other materials." Finding of fact 26. Foster and Kapp also made visits to the jobsite and to HH&J's offices.

Starting on January 7, 1983, HH&J wrote a series of 29 checks, totaling about $20,000, in order to pay for the materials being delivered by Foster. According to the findings, the checks were made payable "to Foster", or "on his behalf", or "at his request". Finding of fact 19. The first check, for $6,300, was dated January 7, 1983; the second, for $8,300, was dated February 16, 1983. At Foster's request, Roger Hansen, another principal in HH&J, made both checks payable to Foster personally. Foster said he needed the first check because the glass was at a salvage yard and was about to be destroyed. He said he needed the second check in order to obtain metal extrusions for the project.

By February 16, Roger Hansen was "nervous about Everett". According to him, in March[9] it "really came to the

---

[7]Finding of fact 14 says that "Kapp submitted plans"; finding of fact 26 says that "Foster supplied designs prepared by Kapp".

[8]Apparently, the reference is to installation materials. Finding of fact 29 expressly states that all installation work was done by non-Fentron employees.

[9]Finding of fact 32 says that HH&J relied on Foster's representations until early April, but Roger Hansen himself testified that he knew at least in March that Fentron was unwilling to enter into a contract. Later, he again testified

table that Fentron was unwilling to enter in to a contract." Hansen asked Foster to sign a written subcontract on behalf of Fentron. Foster refused to sign on Fentron's behalf or in his own name.

In mid-May 1983, Foster absconded to California. At almost the same time, Stanley Tabor, Fentron's contracts administrator, contacted HH&J to request payment for the materials Fentron had supplied. Both Fentron and HH&J then discovered that Foster had not forwarded HH&J's payments to Fentron, but instead had diverted them to his own use. Tabor demanded that Fentron be paid for the materials it had supplied, and HH&J "paid Fentron directly for the Fentron materials which Foster had supplied to the job site." Finding of fact 35. At some point, Tabor told Roger Hansen that Fentron "would like to continue a business relationship with HH&J as to the Tacoma Dome Hotel, that Fentron would cooperate and assist HH&J in pursuing criminal sanctions against Foster, and would cooperate in other unspecified areas." Finding of fact 39.

Beginning June 1, 1983, Kapp was on a self-requested leave of absence from Fentron. While on leave, he supervised the final weeks of construction, which ended in late June or early July. It is unclear whether Tabor knew in May that Kapp was involved, but Tabor did know in June.[10] Tabor and HH&J never discussed Kapp's status as a Fentron employee. Apparently, Kapp was not paid by either Fentron or HH&J while he was on leave.

After mid-May, Tabor learned that the ARCO glass was being used by HH&J. He or his superior knew that the

that in late February or March he knew Everett and Kapp "were doing something on their own".

[10] Tabor denied seeing Kapp at the site. Report of Proceedings, at 321, 324. However, he was impeached with exhibit 52. Exhibit 52 has not been provided as part of the record on appeal. It is described in Report of Proceedings, at 324 as being a May 17, 1983, work order not to issue further materials to HH&J, on which appears the notation, "Al Kapp to deliver this material." In finding of fact 40, the trial court held that Tabor "had facts from which he knew or should have known" that Kapp continued to supervise installation.

glass panels had not met specifications for the ARCO project.[11] He did not inform HH&J of that.

Twelve to eighteen months after installation, the glass began to leak. It then developed that there were various defects in Kapp's design, in installation, and in the glass itself.

The building owner sued HH&J. HH&J settled by paying $81,000. It then cross-complained against Fentron for that amount, plus interest and attorney fees incurred in defending against the building owner. After a bench trial, the Superior Court granted judgment for approximately $108,000. Fentron appeals.

On these facts, it may be assumed that a contract for construction of an exterior glass wall was formed. The issue is whether the parties to the contract were Foster and HH&J, or Fentron and HH&J. According to the briefs of both Fentron and HH&J, Fentron's status as a party turns on three issues: (1) whether Foster and Kapp had apparent authority to sell products on behalf of Fentron; (2) whether Fentron made and breached implied warranties of fitness for a particular use; and (3) whether Fentron ratified Foster's and Kapp's conduct. If any one of these issues is resolved in favor of HH&J, Fentron was a party to the contract.

### APPARENT AUTHORITY

█ Whether apparent authority exists in a particular case is a question of fact. *Bill McCurley Chevrolet, Inc. v.*

---

[11] In finding of fact 37, the trial court said:

Tabor knew that the glass panels were defective in manufacture, and further knew that the glass had been rejected for reasons other than cosmetic reasons. Tabor further was aware that the glass was to have been destroyed by

Fentron, under an agreement between Fentron and the glass manufacturer. Proposed by HH&J, this finding is not supported by substantial evidence at least to the extent that it says Tabor knew the glass had been rejected for noncosmetic reasons. To support the finding, HH&J cites only the testimony of Hess, Fentron's vice-president. Hess testified that he knew the glass had not met specifications for the ARCO project; that he had told others at Fentron that he was to be involved in the disposition of the glass; and that he and Tabor were "concerned" that something was awry when they learned, apparently in May, that the glass had been used by HH&J.

*Rutz*, 61 Wn. App. 53, 57, 808 P.2d 1167, *review denied*, 117 Wn.2d 1015 (1991); *Mauch v. Kissling*, 56 Wn. App. 312, 316, 783 P.2d 601 (1989); *Barnes v. Treece*, 15 Wn. App. 437, 443, 549 P.2d 1152 (1976); *Lockwood v. Wolf Corp.*, 629 F.2d 603 (9th Cir. 1980). The trial court resolved that question in favor of HH&J and against Fentron. On appeal, then, the issue is whether the court's finding of apparent authority is supported by substantial evidence. *Rainier Nat'l Bank v. Clausing*, 34 Wn. App. 441, 444, 661 P.2d 1015 (1983). In deciding that issue, we view the evidence and the reasonable inferences therefrom in the light most favorable to HH&J, which was the prevailing party below. *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978); *Nawrocki v. Cole*, 41 Wn.2d 474, 477, 249 P.2d 969, 35 A.L.R.2d 799 (1952).

■ ■ Both actual and apparent authority depend upon objective manifestations.[12] Restatement (Second) of Agency § 7, comment *b*, at 29 (1958) (hereinafter Restatement) (actual authority); Restatement § 26, comments *a-f*, at 101-03 (same); Restatement § 8, comment *a*, at 30-31; Restatement § 27, comments *a-f*, at 103-06 (apparent authority); *Barnes v. Treece*, 15 Wn. App. at 442 (apparent authority). The objective manifestations must be those of the principal. *Schoonover v. Carpet World, Inc.*, 91 Wn.2d 173, 178, 588 P.2d 729 (1978); *Lamb v. General Assocs., Inc.*, 60 Wn.2d 623, 627, 374 P.2d 677 (1962) (apparent authority); *Lumber Mart Co. v. Buchanan*, 69 Wn.2d 658, 661, 419 P.2d 1002 (1966) (actual authority); *Bill McCurley Chevrolet, Inc. v. Rutz*, 61 Wn. App. at 57; *Mauch v. Kissling*, 56 Wn. App. at 316 (apparent authority). With actual authority, the principal's objective manifestations are made to the agent; with apparent authority, they are made to a third person. *Barnes*, 15 Wn. App. at 442 (apparent authority); Restate-

---

[12]Although agency relationships do not always stem from contract, Restatement (Second) of Agency § 1, comment *b*, at 8 (1958), this objective manifestation requirement is similar to that which governs contract formation. *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977).

ment § 8 & comment *a*; § 27 & comment *a*.[13] An agent's exercise of either type of authority results in the principal's being bound. *Petersen v. Pacific Am. Fisheries,* 108 Wash. 63, 68, 183 P. 79, 8 A.L.R. 198 (1919).

Manifestations to a third person can be made by the principal in person or through anyone else, including the agent, who has the principal's actual authority to make them — *e.g.*, an advertisement in the newspaper, provided it is placed by the principal or an agent with actual authority. Restatement § 8, comment *b*; Restatement § 27, comment *a*, at 104. However, such manifestations will support a finding of apparent authority only if they have two effects. First, they must cause the one claiming apparent authority to actually, *i.e.*, subjectively, believe that the agent has authority to act for the principal. Restatement § 8, comment *c*, at 32. Second, they must be such that the claimant's actual, subjective belief is objectively reasonable. Restatement § 8, comment *c*, at 32; *Bill McCurley Chevrolet, Inc. v. Rutz,* 61 Wn. App. at 56-57; *Amtruck Factors v. International Forest Prods.,* 59 Wn. App. 8, 19, 795 P.2d 742 (1990), *review denied,* 116 Wn.2d 1003 (1991); *Fair Price House Moving Co. v. Pacleb,* 42 Wn. App. 813, 819, 714 P.2d 321 (1986); *Barnes v. Treece,* 15 Wn. App. at 442-43; *Lamb,* 60 Wn.2d at 627-28; *Larson v. Bear,* 38 Wn.2d 485, 490, 230

---

[13]These rules are well summarized in the Restatement (Second) of Agency. With respect to actual authority, Restatement § 26 says in pertinent part:
[A]uthority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.
With respect to apparent authority, Restatement § 27 says in pertinent part:
[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.
And with respect to how the creation of actual and apparent authority differs, comment *a* to Restatement § 27 says in pertinent part:
Apparent authority is created by the same method as that which creates [actual] authority, except that the manifestation of the principal is to the third person rather than to the agent.

P.2d 610 (1951).[14] Obviously, manifestations must be communicated to the claimant before they can have either effect. Restatement § 27, comment *b*, at 105.[15]

The Restatement of Agency summarizes some of the specific manifestations that can, in appropriate circumstances, support a finding of apparent authority. Restatement § 27, comment *a*, at 104 says:

> The information received by the third person may come directly from the principal by letter or word of mouth, from authorized statements of the agent, from documents or other indicia of authority given by the principal to the agent, or from third persons who have heard of the agent's authority through authorized or permitted channels of communication. Likewise, as in the case of [actual] authority, apparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent.

Apparent authority is not created, however, merely because the agent is appointed to or occupies a high position in the principal's organization. *Richardson v. Taylor Land & Livestock Co.*, 25 Wn.2d 518, 171 P.2d 703 (1946) (corporate president); *Betz v. Tacoma Drug Co.*, 15 Wn.2d 471, 131 P.2d 183 (1942) (corporate president); *Parr v. Pacific Storage Warehouse, Inc.*, 124 Wash. 26, 213 P. 677 (1923); *Crown Paving & Constr. Co. v. Walla Walla Cy.*, 122 Wash. 144, 210 P. 357 (1922) (corporate president); *Barnes*, 15 Wn. App. at

---

[14]Again, these rules are well summarized in the Restatement. In § 8, comment *c*, it states:

"Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized. In this respect apparent authority differs from [actual] authority since an agent who is authorized can bind the principal to a transaction with a third person who does not believe the agent to be authorized."

[15]Restatement § 27, comment *b*, states in pertinent part:

"Until there has been a communication to a particular person, and until that person learns facts from which he reasonably infers that the agent is authorized, there is no apparent authority as that word is here used."

442 (corporate vice-president); *Hollywyle Ass'n, Inc. v. Hollister,* 164 Conn. 389, 397, 324 A.2d 247, 252 (1973) (corporate secretary); *Corn Belt Bank v. Lincoln Sav. & Loan Ass'n,* 119 Ill. App. 3d 238, 245, 456 N.E.2d 150, 156 (1983) (chief executive and vice-president).

Based on these rules, the trial court could not have found that either Foster or Kapp ever had Fentron's actual authority to sell products to HH&J. Witnesses from Fentron did not testify to such authority, and neither Foster nor Kapp testified at all.

Returning to apparent authority, we consider three matters: first, whether the evidence supports a reasonable inference that Fentron objectively manifested that Foster had authority to sell materials and designs on its behalf; second, whether the evidence supports a reasonable inference that Fentron objectively manifested that Kapp had authority to do the same, or to supervise installation of the glass; and third, whether the evidence supports a reasonable inference that HH&J's interpretation of Fentron's manifestations was objectively reasonable.

█ The evidence is insufficient to support a reasonable inference that Foster had apparent authority to sell materials and designs on Fentron's behalf. Fentron did not represent to HH&J or anyone else that Foster had authority to contract, nor did it authorize Foster or anyone else to do so on its behalf. It did not furnish Foster with documents or other indicia of authority that could be shown to others, other than business cards and a telephone number. If it objectively manifested that Foster had authority, it did so because (1) it employed him as a "manager of manufacturing services", or (2) because it furnished him with an office, telephone number, and business cards that said he was a "manager of manufacturing services".[16]

---

[16]HH&J attempts to support the finding of apparent authority with many facts that, although true, are not material to the issue. For example, it says that Fentron failed to destroy the scrap glass to prevent its theft and sale by Foster, and that Fentron failed to prevent Everett Foster from buying building materials and personal items on Fentron credit accounts, which credit he failed to repay. We do not consider such facts because they are either not objective manifestations by Fentron or they were not communicated to HH&J at the pertinent times.

By employing Foster as a manager of manufacturing services, Fentron did not manifest that Foster had authority to sell materials and designs on its behalf. Although a general manager may have apparent authority to sell products, *Kitzmiller v. Pacific Coast & Norway Packing Co.*, 90 Wash. 357, 156 P. 17 (1916); 3 Am. Jur. 2d *Agency* § 91 (1956); W. Seavey, *Agency* § 22 (1964), Fentron did not title Foster as its general manager, but instead titled him a "manager of manufacturing services". There is no evidence in the record that one titled "manager of manufacturing services" is customarily or generally understood in the business community to have the authority to sell, and we are unwilling to assume that the title is so understood. Therefore, the fact that Fentron employed and titled Foster as it did is not, by itself, sufficient to support the finding of apparent authority.

Even when the fact that Fentron furnished Foster with an office, telephone, and business cards[17] is combined with his employment and qualified title, there is still insufficient evidence to support a reasonable inference that Fentron manifested that Foster had authority to sell products on its behalf. Taken in the light most favorable to HH&J, this combination of facts shows only that Foster was a Fentron employee whose authority was not apparent. Absent additional relevant evidence, it says nothing about whether he did or did not have Fentron's authority to sell products.[18]

Likewise, the evidence is insufficient to support a reasonable inference that Kapp had apparent authority to sell materials and designs or supervise installation on

---

[17]In its brief, HH&J states, "The trial court relied on evidence of Foster's use of . . . Fentron co-employees", the reference apparently being to Kapp. However, we intentionally omit reference to Kapp's participation. That participation was entirely at the behest of Foster, and was not an objective manifestation of the principal, Fentron.

[18]*Schoonover v. Carpet World, Inc.*, 91 Wn.2d 173, 588 P.2d 729 (1978) and *Walker v. Pacific Mobile Homes, Inc.*, 68 Wn.2d 347, 413 P.2d 3 (1966) contrast interestingly with the present case. In *Schoonover*, the principal, a carpet retailer, placed Rodriguez in sole control of one of its stores. The result was an appearance that Rodriguez had the authority to hire and fire persons to work at

Fentron's behalf. None of the representations and manifestations about Kapp's authority were by Fentron or one of its authorized agents. All were by Foster or Kapp. Given the rule that apparent authority must be grounded on the objective manifestations of the principal, there simply was no evidence that Kapp had apparent authority to deal with HH&J.

■ Finally, the evidence amply showed that HH&J subjectively believed that Foster and Kapp were authorized by Fentron, but it is insufficient to support a reasonable inference that that belief was objectively reasonable. Before HH&J gave the first $6,300 check to Foster, it knew that Foster had requested that the check be made payable to him personally, that the glass was at a salvage yard instead of being in the control of Fentron, and that the glass was to be broken up and reprocessed almost immediately. Even if Fentron had engaged in more objective manifestations than it did, this knowledge by HH&J put it on notice as a matter of law that further inquiry of Fentron was needed.

## IMPLIED WARRANTIES

■ HH&J argues that Fentron impliedly warranted Kapp's designs as being fit for use in the renovation project. We disagree. Although a seller of plans makes such a warranty, *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 29, 442 P.2d 621 (1968), one who is not a seller does not. For the reasons discussed above, there is no reasonable inference that Foster or Kapp had actual or apparent authority, and absent such an inference, the plans were sold by Foster and Kapp, not Fentron.

■ HH&J also seems to contend that Fentron made and breached implied warranties with respect to the ARCO

---

the store, and the plaintiff reasonably relied on that appearance. In *Walker*, the principal placed Stewart and Henderson in sole control of its mobile home sales lot. The result was an appearance that they had the authority to receive the plaintiff's mobile home on consignment, and the plaintiff reasonably relied on that appearance. In the present case, Fentron employed a number of employees at its office, and other than what is discussed in the text, it did nothing to create an appearance that Foster was in control of its office or its operations.

glass and the 2-piece metal extrusions. Again, we disagree. Fentron made no warranty regarding the glass, for the same reason that it made no warranty regarding the plans — there is no reasonable inference that Foster had authority, and absent such an inference, Foster, not Fentron, was the seller of the glass. Fentron impliedly warranted the manufacture of the extrusions, but not their design. Because the only evidence is that the extrusions were faulty due to Kapp's design, there is no evidence that Fentron breached its warranty.

### RATIFICATION

■ HH&J also argues that Fentron ratified the contract. Implied ratification occurs

> [I]f the corporate principal, with full knowledge of the material facts (1) receives, accepts, and retains benefits from the contract, (2) remains silent, acquiesces, and fails to repudiate or disaffirm the contract, or (3) otherwise exhibits conduct demonstrating an adoption and recognition of the contract as binding.

*Barnes*, 15 Wn. App. at 443. The key question is whether the principal's acts demonstrate an intent to affirm the contract. *Barnes*, 15 Wn. App. at 443-44; *Lockwood v. Wolf Corp.*, 629 F.2d 603, 609 (9th Cir. 1980). Ratification can be inferred from the principal's silence if the circumstances are such "that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent . . .." Restatement § 94, comment *a*, at 244.

■ Preliminarily, it is important to segregate facts having to do with Fentron's delivery of materials to the jobsite. Foster lacked authority to act for Fentron, yet he still caused it to deliver the extrusions to HH&J's jobsite. As a result, there was no privity of contract between Fentron and HH&J, but Fentron had the same lien rights as any supplier of materials. RCW 60.04.010. After the parties learned of Foster's deception, Fentron demanded that HH&J make again to Fentron the same payments it had already made to Foster, and HH&J complied. HH&J contends that Fentron's demand for payment evidenced ratification of the contract

to construct the glass wall, and Fentron contends that HH&J's payment evidenced its concession that Foster had no authority. We disagree with both contentions, for the only reasonable inference is that both demand and payment were made pursuant to Fentron's lien rights as a supplier of materials, and independently of the contract to construct the wall.

With these considerations in mind, it is apparent that the evidence does not support a reasonable inference that Fentron did any positive act to ratify Foster's conduct. HH&J had previously concluded that Fentron would not contract with it for construction of the glass wall. After Foster absconded, HH&J, not Fentron, paid the persons working on the construction of the glass wall. In mid-May or later, Tabor told Roger Hansen that Fentron "would like to continue a business relationship with HH&J as to the Tacoma Dome Hotel, and that Fentron would cooperate and assist HH&J in pursuing criminal sanctions against Foster, and would cooperate in other unspecified areas." Finding of fact 39. However, the statement about wanting to continue a business relationship regarding the Tacoma Dome Hotel implies, if anything, an intent not to have such a relationship on other pending projects; the offer to pursue criminal sanctions against Foster surely does not suggest approval or affirmance of his activities; and the offer to cooperate is simply too vague to support a finding of ratification.

Nor is there a reasonable inference that Fentron's silence, if any, was a ratification. Tabor knew that the glass had been rejected from Fentron's ARCO project, but it is also clear that HH&J knew it had purchased scrap glass.[19] Kapp was working on the project, but after the discovery of Foster's deception, no one could reasonably have assumed without checking that Kapp had Fentron's authority to do that. Finally, HH&J believed that Fentron had previously refused to contract, and there was simply nothing in Fentron's conduct or silence that would have caused a

---

[19]It is undisputed that HH&J gave the first $6,300 check to Foster so that he could go save the glass from destruction.

reasonable person to conclude that Fentron's intent had changed.

Reversed with directions to dismiss the complaint.

WORSWICK, C.J., and ALEXANDER, J., concur.

Review denied at 118 Wn.2d 1023 (1992).