[No. 29512-8-I. Division One. April 12, 1993.]

CONSUMERS INSURANCE COMPANY, *Appellant,* v. NORMAN E. CIMOCH, ET AL, *Respondents.*

*Daniel E. Huntington* and *Richter-Wimberley,* for appellant.

*William B. Foster,* for respondents.

SCHOLFIELD, J. — Consumers Insurance Company appeals the trial court's judgment in favor of Mary Ann Cimoch, claiming the trial court erred in dismissing its claim against the marital community of Norman Cimoch and Mary Ann Cimoch, dismissing its claim against Mary Ann Cimoch individually, and awarding Mary Ann Cimoch attorney's fees. We affirm.

The issues presented in this case are whether Norman Cimoch's agreement to purchase the stock of a corporation subjected his marital community to liability where his wife, Mary Ann Cimoch, did not join in the transaction, and whether Mary Ann Cimoch ratified the transaction so as to incur separate liability for the obligation.

Appellant Consumers Insurance Company (Consumers) is one of several subsidiaries of Metropolitan Mortgage Company, a closely held corporation. Metropolitan Mortgage is engaged in the business of buying real estate receivables, contracts, mortgages, and deeds of trust, and is also engaged in life insurance and real estate transactions.

The immediate subsidiary to Metropolitan is Consumers Group Holding (CGH), an insurance holding company. Beneath CGH is appellant Consumers. Both Western United Life and its sister company, Consumers Indemnity Company (CIC), were subsidiaries of Consumers. CIC was formed in 1981 from a "reciprocal"[1] insurance company known as Consumers Insurance Exchange (CIE).

Respondents Norman and Mary Ann Cimoch were married in 1957 and divorced in 1989. During the marriage, the Cimochs acquired Northwest Underwriters (NWU), which commenced business in 1971. NWU acted as a general agent and sold mechanical breakdown insurance to car dealerships. As general agent, NWU sold policies issued by insurers and administered claims made on those policies.

In the late 1970's, NWU acted as a general agent for CIE. Until 1984, NWU was the only general agent selling policies through CIE and its successor, CIC. Norman Cimoch held a position on the board of directors of CIE and CIC from the time of the former company's commencement through 1984. As part of his compensation package, he received a salary and options to purchase stock in CGH.

In early 1984, Norman Cimoch began negotiating with the parent company of CIC, appellant Consumers, for the purchase of CIC. As of this time, Norman Cimoch had acquired a substantial amount of stock (worth approximately $1.5 million) through the compensation agreement. Cimoch advised his then wife, Mary Ann Cimoch, that he was interested in acquiring CIC, and that the acquisition would take place by an exchange of the stock he had acquired for the capital stock of CIC.

Consumers was represented by several persons during the negotiations, including the current president of Metropolitan. Consumers' attorney, Charles Carroll, drafted the stock sale agreement. Norman Cimoch was the only person involved from the purchaser's end of the transaction. He

---

[1]A "reciprocal" insurance company is a less than fully capitalized insurance company.

initially believed he could transfer his CGH stock, valued at between $1.3 and $1.6 million, for the CIC stock.

The negotiations culminated in the execution of a "Stock Sale Agreement", dated June 10, 1984. The agreement was drafted by appellant Consumers, and called for Norman Cimoch to purchase the capital stock of CIC for a total price of $2,952,000, to be paid in monthly installments of approximately $14,137 per month. These installments later were temporarily adjusted to over $16,800 per month. This agreement made no reference to the exchange of Norman Cimoch's CGH stock as part of the purchase price; however, an exchange of this stock was later arranged as a partial payment of the total purchase price.

Although Mary Ann Cimoch was informed that the transaction had been completed, she was not advised that it involved anything other than a stock transfer, and she was not aware that the transaction involved any cash outlay or debt. The agreement was not prepared for Mary Ann Cimoch's signature, nor was she invited to review the agreement, approve or disapprove it, or sign it. Norman Cimoch did not tell his wife that the terms of the transaction had changed, and did not inform her of his obligation to pay installments of over $14,000 per month under the agreement. Norman did not tell Mary due to his concerns about her scrutinizing the transaction.

Following the execution of the agreement, NWU continued to operate as a general agent for CIC, utilizing its previously existing sales staff of over 30 representatives to generate sales of the policies. CIC continued to issue mechanical breakdown policies until 1988, when the State Insurance Commissioner obtained an order appointing a receiver for CIC. Norman Cimoch did not pay the monthly installment due under the purchase and sale agreement due on September 1, 1988, nor did he make any payments under the agreement thereafter.

Before and after the execution of the agreement, the Cimochs received salaries and other benefits from CIC. Mary Ann Cimoch did not learn, until the current action was com-

menced in October 1988, that Norman Cimoch had consummated the transaction by any means other than the exchange of his previously acquired stock.

In October 1988, Consumers Insurance Company brought this action against Norman Cimoch, Mary Ann Cimoch, and Cimoch, Inc., a Washington corporation, seeking damages for breach of contract. Consumers later filed an amended complaint seeking damages against Norman Cimoch individually, Mary Ann Cimoch individually, and the marital community of Norman and Mary Ann Cimoch. Norman Cimoch and Mary Ann Cimoch filed separate answers denying Consumers' claims.

Prior to trial in this case, the trial court entered partial summary judgment in favor of respondents, ruling that Mary Ann Cimoch had not consented to the execution of the agreement by Norman Cimoch. Consumers does not assign error to this finding.

The case was tried to the court in July 1991. The court concluded that Norman Cimoch breached the purchase and sale agreement and that judgment should be entered against him individually for installment payments currently due and those to become due. The court ruled the agreement did not bind the marital community of Mary and Norman Cimoch under RCW 26.16.030(6) because Mary Ann Cimoch did not join in the transaction, consent to the agreement, or ratify Norman Cimoch's execution of the agreement. For the same reasons, the court ruled the agreement did not bind Mary Ann Cimoch individually. Therefore, the court dismissed with prejudice Consumers' action against Mary Ann Cimoch individually and against the community of Mary Ann Cimoch and Norman Cimoch. This appeal followed.

Consumers contends a contractual agreement to purchase the stock of a business creates a marital community obligation and is not excepted from the rule of community liability by RCW 26.16.030(6).

The Cimochs (respondents) contend that an agreement to purchase the assets of a business through the purchase of all

the capital stock of the corporation requires the participation of both spouses.

The dispute centers on the proper interpretation to be given to RCW 26.16.030(6). That statute states as follows, in part:

> Property not acquired or owned, as prescribed in RCW 26.16-.010 and 26.16.020, acquired after marriage by either husband or wife or both, is community property. Either spouse, acting alone, may manage and control community property, with a like power of disposition as the acting spouse has over his or her separate property, except:
>
> . . . .
>
> (6) Neither spouse shall acquire, purchase, sell, convey, or encumber the assets, including real estate, or the good will of a business where both spouses participate in its management without the consent of the other: PROVIDED, That where only one spouse participates in such management the participating spouse may, in the ordinary course of such business, acquire, purchase, sell, convey or encumber the assets, including real estate, or the good will of the business without the consent of the nonparticipating spouse.

Assuming for the moment that the statute governs the acquisition of an incorporated business, it can be seen that the present transaction does not bind the marital community under subsection (6). If Mary Ann Cimoch is regarded as having participated in the management of the couple's business operations, it is not a transaction of the marital community given the trial court's uncontested finding that she did not consent to the acquisition.[2] If she is treated as having been a nonparticipant, the transaction fails to bind the marital community due to the trial court's uncontested finding that the acquisition was not in the ordinary course of NWU's business or the business of the Cimoch marital community.

Consumers contends that RCW 26.16.030(6) applies only to existing businesses, and is not applicable to the purchase of a new business. There is some support for this claim in the wording of the statute itself. The statute seems to refer

---

[2]The effect of any possible ratification by Mary Ann Cimoch will be discussed later.

to existing community businesses, not those to be acquired. However, the statute has not been construed in the fashion urged by Consumers.

In *Pixton v. Silva*, 13 Wn. App. 205, 534 P.2d 135 (1975), the court addressed whether the acquisition of a dairy farm by a dairy operator, Manuel Silva, could legally bind the Silva community under the ordinary course of business exception of RCW 26.16.030(6), where Mrs. Silva had not been joined in the transaction. The court ruled that even if Mr. Silva were the sole manager of the couple's present dairy business, "the sale of a community dairy in one area and the purchase of a . . . community dairy in another area is not 'in the ordinary course of *such* business.' " *Pixton*, at 210. The court ruled that, under RCW 26.16.030(6), Mr. Silva could not alone bind the community to the purchase of plaintiffs' dairy.

> [A]lthough the section does not explicitly address itself to the purchase of a community business, it does state, in part, "Neither spouse shall *acquire, purchase* . . . the assets, including real estate, and goodwill of the business without the consent of the other . . . ." This language along with the policy of protecting the community "blue chip" assets suggests that *both spouses always will need to consent to an acquisition of a community business*.

*Pixton*, at 210 (quoting Cross, *Management and Disposition of Community Property*,[3] 48 Wash. L. Rev. 527, 541 (1972-1973)).

Consumers contends the wording of subsection (6) is ambiguous, whereas the wording of the general provision (RCW 26.16.130) is clear. Relying on *State v. Wright*, 84 Wn.2d 645, 652, 529 P.2d 453 (1974), Consumers claims that statutory provisions excepting or limiting the general statute to which they are appended should be strictly construed with any doubt to be resolved in favor of the general provisions, rather than the exceptions. While there is some force to this argument, we do not believe a strict or literal construction of RCW 26.16.030(6) would be consistent with the

---

[3]The *Pixton* court stated the incorrect title for the Cross article. The proper title is *Equality for Spouses in Washington Community Property Law — 1972 Statutory Changes*.

purposes of the provision.[4] We are in accord with Professor Cross' belief that, although not explicitly stated in the statute, the language and policy of RCW 26.16.030(6) indicate that both spouses must consent to the acquisition of a community business. *See* Cross, *Equality for Spouses in Washington Community Property Law — 1972 Statutory Changes*, 48 Wash. L. Rev. 527, 541 (1972-1973).

Consumers relies on *Brown v. Boeing Co.*, 28 Wn. App. 370, 622 P.2d 1313 (1980) as an example of the reluctance of this court to expand the exceptions listed in RCW 26.16.030 beyond the specific items listed. The *Brown* court held that a husband's selection of a pension payout option did not fall within the exceptions of RCW 26.16.030(1) through (6) (and thus did not require joinder or consent of the nonacting spouse), so long as the community remains the beneficiary. *Brown*, at 374. *Brown* is not controlling here as it involved a pension payout option, not the acquisition of a community business.

Consumers next argues that even if RCW 26.16.030(6) applies to the purchase of a new business, it does not apply to the acquisition of a business through a purchase of corporate stock. There is support for this interpretation of the statute:

> The business to which the statute refers may be conducted as a corporation, a sole proprietorship, or a partnership. The statute may not apply to a community business conducted in corporate form because the community interest is in the stock of the corporation, and not in the business assets. However, the statute might well apply to a family-owned corporation which has been conducted with little or no regard to the niceties of corporate status.

Washington State Bar Ass'n, *Community Property Deskbook* § 4.15, at 4-15 (2d ed. 1989). *See also* Cross, *Community*

[4]Professor Cross has stated as follows regarding the purpose of RCW 26.16-.030(6): "[T]he purpose of requiring consent in transactions involving the community business is to protect the nonacting spouse (and thus the community) from imprudent and arbitrary decisions involving 'blue chip' community assets. . . .

"Requiring the consent of both spouses in community business transactions predominates in the new paragraph (6), *reflecting a policy judgment that community business transactions should be subject to joint consent*." (Italics ours.) Cross, at 538-39.

*Property Law in Washington (Revised 1985),* 61 Wash. L. Rev. 13, 90 (1986) (probable that incorporated business will not be within provision unless most corporate shares are owned by spouses and corporate form disregarded).

The rationale for the above interpretation appears to be as follows: Because a marital community's ownership of a corporation is through the corporation's stock, and individual assets are owned by the corporation and not the community, the purchase or disposition of such assets does not impact a community interest. Asset purchases are liabilities of the corporation and not the community (unless there is personal liability emanating from a disregard of the corporate form).

The above principle is reasonable when applied to an existing corporation in which the community owns stock. However, it is not reasonable when applied to a newly acquired corporation. One spouse's act of incurring a large liability in order to acquire a corporation through a stock purchase certainly impacts community resources. Given the language of RCW 26.16.030(6) and the policy of protecting community " 'blue chip' " assets, *see* Cross, 48 Wash. L. Rev. at 541, there is no principled basis for treating the acquisition of a sole proprietorship or other business form differently from the acquisition of a corporation. We therefore hold that RCW 26.16.030(6) is applicable to one spouse's acquisition of a corporation through a stock purchase.[5]

Consumers next contends that a wife ratifies her husband's contract to purchase stock when she has general knowledge of the transaction and accepts the benefits of the transaction. It claims that a wife's ratification of the transaction creates separate liability in the wife as well as marital community liability for the obligation. Consumers claims that in this case, the trial court erred in finding that Mary

---

[5]Consumers relies on *Protzman v. Billings,* 120 Wash. 123, 206 P. 848 (1922) in arguing that the community should be bound by Norman Cimoch's acts. *Protzman* was decided on the basis of pre-1972 law, from which RCW 26.16-.030(6) significantly departs. *See* Cross, 48 Wash. L. Rev. at 530 n.13. We therefore do not view *Protzman* as controlling.

Ann Cimoch did not ratify the transaction entered into by her husband.[6]

The consent requirement of RCW 26.16.030(6) can be met by ratification by the nonparticipating spouse. *See Reid v. Cramer*, 24 Wn. App. 742, 747, 603 P.2d 851 (1979) (joinder requirement of RCW 26.16.030(4) is satisfied if there is sufficient evidence of authorization or ratification of the transaction by nonacting spouse).

> Since the requirement of "participation" in real property trans-
> actions can be met by ratification, estoppel or authorization, it
> certainly follows that the "consent" requirement of R.C.W. §
> 26.16.030(6) should be satisfied if the nonacting spouse autho-
> rizes or ratifies the transactions or is estopped to disaffirm the
> contract.

Cross, 48 Wash. L. Rev. at 538-39. Ratification in community property law rests on principles of agency. *Smith v. Dalton*, 58 Wn. App. 876, 881, 795 P.2d 706 (1990). "Ratification is the affirmance by a person 'of a prior act which did not bind him but which was done or professedly done on his account.' " *Smith*, at 881 (quoting *Nichols Hills Bank v. McCool*, 104 Wn.2d 78, 85, 701 P.2d 1114 (1985)).

In *Geoghegan v. Dever*, 30 Wn.2d 877, 194 P.2d 397 (1948), the court adopted the following rule regarding ratification:

> "In order that her conduct or acts may operate as a ratifica-
> tion, it is essential that the wife should have full knowledge of
> all the facts and a reasonable opportunity to repudiate the
> transaction; and the retention of benefits after acquiring
> knowledge of the facts does not amount to a ratification if at
> that time conditions are such, without the fault of the wife,
> that she cannot be placed in statu[s] quo or cannot repudiate
> the entire transaction without loss."

*Geoghegan*, at 898. Relying on a case cited by the *Geoghegan* court, *Heinzerling v. Agen*, 46 Wash. 390, 393, 90 P. 262 (1907), Consumers contends that a ratification can occur where the principal accepts the benefits of the contract.[7]

---

[6]We do not address Consumers' other assignments of error to the trial court's findings because we do not view them as having any bearing on the outcome of this case.

[7]Mary Ann and Norman Cimoch received benefits from CIC in the form of salaries from 1984 to 1988. Their combined salaries from CIC during those years

*Heinzerling* and other cases have stated the rule in this fashion. *See Stroud v. Beck*, 49 Wn. App. 279, 286, 742 P.2d 735 (1987) (for principal to be charged with unauthorized act of agent by ratification, it must act with full knowledge of the facts or accept benefits of act or intentionally assume the obligation imposed without inquiry). *See also Swiss Baco Skyline Logging, Inc. v. Haliewicz*, 18 Wn. App. 21, 32, 567 P.2d 1141 (1977).

To the extent the above rule is construed as imposing liability based solely on a principal's acceptance of benefits, it does not accurately reflect the law. "The acceptance or retention of benefits derived from an agent's unauthorized act does not amount to a ratification of such act if the principal, in accepting such proceeds or benefits, does not have knowledge of all the material facts surrounding the transaction." (Footnote omitted.) 3 Am. Jur. 2d *Agency* § 195, at 698 (1986). *See also Smith v. Hansen, Hansen & Johnson, Inc.*, 63 Wn. App. 355, 369, 818 P.2d 1127 (1991) (ratification occurs where corporate principal, *with full knowledge of the material facts*, receives, accepts, and retains benefits from a transaction), *review denied*, 118 Wn.2d 1023 (1992); *Barnes v. Treece*, 15 Wn. App. 437, 443, 549 P.2d 1152 (1976). In a series of uncontested findings, the trial court in this case found that Mary Ann Cimoch had no knowledge of the details of the transaction entered into by her husband. The court also found that there was no reason for Mary Ann Cimoch to know

> by virtue of the operation of either Northwest Underwriters or Consumers Indemnity after the execution of the agreement in June, 1984, that the Agreement had been completed in any manner other than that which had been represented to her, that is, a straight exchange of stock previously acquired by Norman Cimoch.

Finding of fact 19. Mary Ann Cimoch testified she would never have agreed to the actual terms of the agreement. Because she did not know or have reason to know of the

---

are as follows: 1984: $144,000; 1985: $237,295; 1986: $231,000; 1987: $21,540; 1988: $0.

terms of the transaction, she could not ratify it simply by accepting salary benefits from CIC. The trial court's finding that Mary Ann Cimoch did not ratify the transaction must be upheld.

There is no basis for individual liability because Mary Ann Cimoch did not ratify the transaction. Pursuant to the contractual attorney's fee clause in the purchase and sale agreement, and RCW 4.84.330, respondents Mary Ann Cimoch and the marital community are entitled to attorney's fees at trial and on appeal.

Judgment affirmed.

PEKELIS, A.C.J., and KENNEDY, J., concur.